UNITED STATES of America,
Plaintiff–Appellee,

v.

William POULOS, Defendant–Appellant.

No. 88–3181.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 8, 1989.

Decided Feb. 9, 1990.

Ann Rowland, Asst. U.S. Atty., James V. Moroney (argued), Cleveland, Ohio, for U.S.

Larry W. Zukerman (argued), Greene & Hennenberg, Cleveland, Ohio, for William Poulos.

Before KENNEDY and NELSON, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

Defendant-appellant William Poulos appeals his conviction for conspiring to knowingly receive and possess unregistered silencer-equipped firearms in violation of 18 U.S.C. § 371 and 26 U.S.C. §§ 5861 and 5871 (Count I); receiving and possessing a firearm bearing no serial number or registration as required by 26 U.S.C. §§ 5841 and 5842, in violation of 26 U.S.C. § 5861 and 26 U.S.C. § 5871 (Counts II and III); and two counts of possessing unregistered silencers without serial numbers in violation of 26 U.S.C. §§ 5861 and 5871 (Counts V and VI). Poulos contends that there was insufficient evidence for the jury to conclude that he entered the conspiracy charged in Count I and that there was insufficient evidence supporting the jury's verdict that he constructively possessed the firearm alleged in Counts II and III. He further asserts that two silencer kits seized from his basement during a legal search, the basis for Counts V and VI, were not in plain view nor statutorily defined as firearms at the time of their seizure by law enforcement officers. Finding sufficient evidence whereby a reasonable jury could conclude that Poulos joined the firearms conspiracy, that Poulos constructively possessed an illegal silencer-fitted .22 caliber pistol, and that it was "immediately apparent" that the silencer component parts discovered in Poulos' basement were evidence of a crime and lawfully seized pursuant to the plain view doctrine, we affirm.

I.

In 1986, the Internal Revenue Service (IRS) commenced an undercover money laundering investigation directed at William J. Wunderle and appellant William Poulos. At the time of the investigation, Poulos owned a cement company in Canton, Ohio and along with Wunderle, was attempting to start a savings and trust business using a leased old bank building in Canton. Using the name Scott McBride, an

IRS undercover agent named Vernon Mason met with Poulos and Wunderle on several occasions in the course of the money laundering probe. The investigation was expanded from illegal financial transactions to unlawful transactions in firearms as a result of a May 8, 1987 meeting between IRS Agent Mason, Wunderle, and Michael Sidener,[1] an acquaintance of Wunderle and Poulos. At the May 8, 1987 meeting, which was originally scheduled for a discussion of financial dealings, Agent Mason expressed an interest in an automatic weapon. Subsequently, conversation quickly turned to a general discussion of weapons wherein Sidener represented that he could provide weapons without the required "papers."[2] Thereafter, in a series of telephone conversations on May 18th and 19th, Wunderle and Agent Mason negotiated for the purchase of numerous automatic weapons and a sample buy was discussed.

Five days later, Joe David Artman, Sidener's source for firearms, and Charles Hair, residents of Texas who owned a firearms business and who also provided computer consulting services to Poulos and Sidener, travelled from Texas to Canton to assist Poulos and Sidener in deciphering some computer disks. At a luncheon meeting, Wunderle asked Artman and Hair whether "they could provide him or someone he knew with automatic weapons or suppressors." Hair then explained the requisite logistics for a transaction.

Two days after the luncheon meeting, Sidener told Agent Mason that he and his associates did not want Wunderle to be part of the transaction.[3] Poulos was then contacted by Agent Mason who asked Poulos to have Sidener make "the sample" available at their next meeting. Poulos, who spoke with Sidener most every morning, agreed to transmit Mason's message to Sidener.

On June 2, 1987, a meeting was held between Poulos, Agent Mason, and Sidener in Poulos' bank building. Poulos informed Mason that no "samples" were immediately available and that any firearms transaction would require Mason to "pay up front." In the course of the meeting numerous telephone calls were made. As to one phone conversation, Artman testified that Sidener telephoned him requesting a suppressor for a .45 caliber pistol and that Sidener gave him instructions to ship the .45 silencer to Poulos' business address in Canton, which Artman did via UPS. Artman further testified that he told Sidener that when he returned to Canton on June 4th, he would bring a .22 caliber silencer-equipped pistol, a weapon Poulos had requested in the latter part of May, 1987, on the last day of Artman and Hair's first stay in Canton. Poulos ostensibly desired the firearm for target shooting in his basement.

Following Sidener's telephone conversations with Artman, Sidener reported to Agent Mason that Artman had the weapons sought by Mason, but that delivery would be later than desired. Sidener informed Mason that Artman would, however, be bringing a "close-up assassination tool that looks like a standard production model target pistol" for Poulos. Agent Mason testified that Poulos indicated to him that he might allow Mason to use the pistol Artman was bringing for Poulos. At the end of the meeting, Sidener advised Mason about dealing with Artman and Hair, and Poulos admonished Mason not to

---

1. A jury found defendant Sidener guilty of weapons-related charges under 18 U.S.C. § 371 and his conviction was upheld on appeal in an unpublished decision of this court. *United States v. Sidener*, 888 F.2d 1392 (6th Cir.1989).

2. When asked by Agent Mason, who had a tape recorder in his brief case and was wearing a concealed transmitter, if guns with silencers could be purchased without the legally required "papers," i.e., proper registration, Sidener responded, "yes."

3. Sidener informed Mason: "All right, let me tell you this right now. None of the people that I do business with are going to get involved in the equipment that you need if Wunderle has anything to do with the deal." Thus, while Poulos emphasizes conversations from May 18th and 19th, 1987 in which Wunderle informed Mason that Poulos was not involved in the deal at all, and that Mason should keep the deal quiet from Poulos, we find that on May 26th, 1987, Wunderle was ejected from the deal and soon thereafter Poulos became involved.

talk with Wunderle or anyone else about the deal.

Pursuant to the arrangements made on June 2nd, Agent Mason arrived at Poulos' bank building on June 4th to purchase a silencer-fitted pistol. When Poulos arrived, Artman informed him that a package (the .45 suppressor) had been sent via UPS to Poulos' business address and Poulos responded "alright" to Artman's disclosure that the package was sent to him. Mason then approached Artman and offered to purchase the .22 caliber silencer-equipped pistol that Artman had brought for Poulos. While Poulos apparently was not privy to this initial conversation between Artman and Mason regarding the sale of the weapon, Poulos did approve of Artman's offer to demonstrate the weapon in response to Mason's inquiry. After Poulos assisted Artman in test firing the weapon into a telephone book, Agent Mason asked Poulos if he could buy the weapon. Poulos responded "[y]eah, we can work it out.... I don't need it that bad." Mason subsequently paid Artman $400.00 for the silencer-fitted weapon and then asked Poulos if $100.00 would be sufficient to take care of him until Artman could get Poulos a replacement weapon. Although Poulos responded, "whatever you feel ... I can't do anything," he nonetheless said "alright" to one hundred dollars and accepted the money from Agent Mason.

After the transaction for the silencer-equipped pistol was completed, Artman reiterated that the .45 caliber silencer "sample" for Agent Mason would be delivered to Poulos' business and Artman recommended that Poulos call Mason upon the silencer's being delivered by UPS. Poulos clearly acknowledged Artman's instructions.

The following day, Mason called Poulos and asked if the "package" had arrived. While responding that the silencer had not yet arrived, Poulos and Mason further discussed whether the .45 caliber silencer had been sent alone or with a gun. After consulting someone, Poulos informed Agent Mason, "... no body to it. No, just a can's comin' up." (just a silencer was being

shipped). Poulos then suggested that Mason call the following Monday to check on the silencer's delivery.

Thereafter, on June 7, 1987, defendants Sidener, Artman, Hair, Wunderle and Poulos were arrested, and search warrants for financial records were issued and executed at the bank building and at Poulos' residence. In the basement of Poulos' home, while agents were searching for financial records, two silencer kits were discovered and seized. A third search warrant was executed at the UPS terminal in Canton, Ohio on June 9, 1987, and the .45 caliber silencer shipped by Artman to Poulos' business address was seized.

All the defendants were charged in a 13 count indictment with various money laundering and firearms violations, and except for Poulos and Sidener, they all pled guilty to one or more offenses. Poulos and Sidener were then tried pursuant to a seven count superseding indictment. At the conclusion of the government's case, the district court dismissed Count IV (solicitation to commit murder for hire) as to Poulos. However, on February 3, 1988, after a nineteen day trial, the jury found both defendants guilty on all remaining counts. Sidener was sentenced to three years imprisonment on Count I (conspiracy), and Poulos was sentence to three years imprisonment on each of the five counts for which he was convicted, the sentences to run concurrently with one another. After Poulos' motions for acquittal and alternatively for a new trial were denied, this timely appeal ensued.

## II.

 Poulos' initial contention on appeal is that the evidence was insufficient to convict him of Count I of the indictment, conspiracy to receive, possess, and transport interstate firearms bearing no serial numbers or registration as required by 26 U.S.C. §§ 5841 and 5842. Specifically, Poulos asserts that the government failed to prove the existence of an agreement between Poulos and others to violate the law and that the government failed to establish

that he had the requisite intent to violate the applicable federal firearms statutes.

In assessing Poulos' challenge to the sufficiency of the evidence supporting his conspiracy conviction, this court must determine "whether the relevant evidence viewed in the light most favorable to the government could be accepted by a reasonably-minded jury as adequate and sufficient to support the conclusion of defendant's guilt beyond a reasonable doubt." *United States v. Scaife*, 749 F.2d 338, 347 (6th Cir.1984) (citing *United States v. Meyers*, 646 F.2d 1142, 1143 (6th Cir.1981)). If after viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in the government's favor, *United States v. Tilton*, 714 F.2d 642, 645 (6th Cir.1983) (per curiam), the evidence is sufficient to justify a reasonable juror's conclusion that each element of the offense has been established beyond a reasonable doubt, the conviction will be affirmed. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ As established in *United States v. Meyers*, 646 F.2d 1142 (6th Cir.1981):

> The essential elements of conspiracy are: (1) that the conspiracy described in the indictment was willfully formed, and was existing at or about the time alleged; (2) that the accused willfully became a member of the conspiracy; (3) that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, at or about the time and place alleged; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged.

*Id.* at 1143–44 (citations omitted). "The existence of a criminal conspiracy need not be proven by direct evidence, a common plan may be inferred from circumstantial evidence." *Id.* at 1144 (citing *United States v. Luxenberg*, 374 F.2d 241, 250 (6th Cir.1967)). Furthermore, once a conspiracy has been established, only slight evidence is necessary to implicate a defendant. *See United States v. Mayes*, 512 F.2d 637, 647 (6th Cir.)(citations omitted), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975).

Relying upon secretly taped conversations between undercover Agent Mason and co-conspirators William Wunderle, Michael Sidener, Joe David Artman and Charles Hair, as well as upon the testimony of co-conspirator Artman and Agent Mason, we find that the government presented extensive evidence whereby a reasonable jury could have found Poulos to have willingly entered and participated in the alleged conspiracy to knowingly receive and possess unregistered firearms that were not identified by serial numbers as required by law, and then to have conspired to transport the weapons in interstate commerce, all in violation of 18 U.S.C. § 371.

Evidence was presented that on May 27, 1987, Agent Mason informed Poulos that if Poulos saw Sidener, "ask him if he could have that sample for me when I come over next Tuesday" to which Poulos responded, "all right." Thereafter, at a meeting on June 2nd between Agent Mason, Poulos, and Sidener in Canton, Poulos, in reference to automatic weapons and silencers, informed Mason that "you know you gotta pay up front or they won't bring them up. They got to come out of Texas." Poulos' awareness of the conspiracy, i.e., that a "sample" was going to be brought for Agent Mason and that the "sample" was an illegal firearm, was further established by the conversation between Mason and Poulos on June 2nd in which Poulos informed Mason that regarding the "sample" weapon, which Mason desired and expected to have available at the June 2nd meeting, "well, they couldn't get them up here today." Poulos' knowledge of the firearms conspiracy could clearly be inferred from these statements. Moreover, on June 4th, Artman told Poulos that he had sent a "package" via UPS to Poulos' business address. Since Poulos' knowledge of the illicit nature of the "package" could be inferred from the evidence presented at trial, by knowingly providing a repository for the sample firearm sent from Texas to Canton, Ohio, Poulos demonstrated his willful participation in the conspiracy.

Consequently, as to the "sample" .45 caliber Mac–10 silencer, drawing every reasonable inference in favor of the government, *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789; *United States v. Strong*, 702 F.2d 97, 100 (6th Cir.1983), we find that based upon the recorded conversations and testimony introduced at trial, sufficient evidence was presented for a jury to conclude that Poulos willfully participated in and furthered an ongoing conspiracy.

While sufficient evidence was presented that Poulos knew that a package (the .45 silencer) was being sent via UPS to his business address, even more incriminating evidence was presented regarding the .22 caliber silencer-equipped pistol requested by Poulos during Artman and Hair's initial trip to Canton.

Based upon the testimony of Agent Mason and Artman, the government was able to establish that Poulos was aware that at least one silencer-equipped target pistol was going to be transported from Texas to Canton and that Poulos made the weapon available to Agent Mason. The evidence relating to the June 4th meeting at the bank building further demonstrated that the .22 caliber silencer-equipped pistol was demonstrated in the presence of Poulos and that Mason made a deal with Poulos so that Mason could immediately obtain the weapon from Artman. It is uncontested that Agent Mason paid Poulos $100.00 and that the firearm was not registered and did not bear a serial number. Poulos argued at trial that he thought Artman was providing a legitimate (registered) weapon, and that the $100.00 was compensation for damage inflicted to Poulos' wall by the test firing of the weapon. Poulos' contentions, however, were rejected by the jury, which, based upon the evidence presented, found the government's explanation of events to be more compelling. We find no error in the jury's determination as to the credibility of Poulos' story.

■ Poulos also maintains that he did not have the requisite intent to violate the applicable federal firearms statutes. Poulos argued to the jury that he knew Artman was a legitimate certified arms dealer and that he never requested an unregistered firearm bearing no serial number from Artman. To uphold a conviction for conspiracy to violate the National Firearms Act ("Act") 26 U.S.C. § 5812(a) *et seq.*, however, there is no requirement of specific intent or knowledge that the firearms were unregistered. *United States v. Freed*, 401 U.S. 601, 607, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971); *United States v. Woodlan*, 527 F.2d 608, 609 (6th Cir.) (per curiam), *cert. denied*, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976); *United States v. Sanders*, 462 F.2d 122, 124 (6th Cir.1972). "[T]he only knowledge required to be proved was knowledge that the instrument possessed was a firearm." *Freed* 401 U.S. at 607, 91 S.Ct. at 1117. "The act does not require knowledge that the firearm was not registered or that it was required to be registered." *Woodlan* at 609. As previously noted, based upon numerous recorded conversations and the testimony of Artman and Agent Mason, sufficient evidence was presented by the government whereby a reasonable jury could conclude that Poulos was aware that a firearm (an illegal silencer-equipped pistol) was being transported from Texas for his use. Furthermore, a reasonable jury could conclude that Poulos was aware that an illicit "sample" firearm (a .45 caliber silencer) was being sent to his business address for purposes of furthering the conspiratorial goal of providing (illegal) firearms to undercover Agent Mason.

Accordingly, we find that the evidence was sufficient to implicate Poulos in the conspiracy as to both a Mac–10 .45 caliber silencer sent to his business address and as to a .22 caliber silencer-equipped target pistol transported pursuant to his request.

### III.

■ Poulos' next contention on appeal is that the evidence was insufficient to establish his possession of the silencer-fitted .22 caliber pistol brought by Artman for Poulos on June 4, 1987.

■ Culpable possession under the National Firearms Act may be either actual or

constructive. *See United States v. Craven*, 478 F.2d 1329–33 (6th Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973). In the case at bar, the government alleged that Poulos constructively possessed the silencer-equipped .22 caliber weapon. "Constructive possession requires that a person knowingly have the power or the intention at a given time to exercise dominion and control over an object, either directly or through others. *United States v. Birmley*, 529 F.2d 103, 107 (6th Cir.1976) (citations omitted). "Presence on the scene plus association with illegal possessors is not enough to support a conviction for illegal possession of an unregistered firearm." *Id.* However, while "presence alone cannot show the requisite knowledge, power, or intention to exercise control over the unregistered firearms," *Birmley* at 107–08, substantial "other" incriminating evidence, combined with presence, serves to demonstrate Poulos' constructive possession of the firearm at issue. *See Birmley* at 108 ("[O]ther incriminating evidence, coupled with presence ... will serve to tip the scale in favor of sufficiency.") (citations omitted).

The supplier of the Hi-standard .22 caliber pistol, Artman, testified that Poulos requested the weapon during Artman's initial visit to Canton. Poulos testified that he had no knowledge that Artman was bringing the weapon to Canton on June 4th, but in a secretly recorded conversation from June 2nd between Agent Mason, Sidener, and Poulos, in which Agent Mason expressed an interest in a silenced .22 caliber target pistol, Poulos acknowledged that a weapon was forthcoming and he exhibited "dominion and control" over the firearm at issue when he told Agent Mason, "I might let you use it [the silenced pistol] but I ain't sure."

Thereafter, on June 4th when the weapon was brought to Canton, evidence was presented that Poulos was present when Artman demonstrated the .22 caliber silencer-equipped pistol in the basement of Poulos' building. After the firearm demonstration, Agent Mason expressed an urgent desire for the weapon and the following conversation occurred:

> Agent Mason: ... we got something going where I got a need right away for one of those things, and he said [Sidener], if you were going to let me have it, get you another one real quick.
>
> Poulos: Yeah, we can work it out.
>
> Agent Mason: You don't mind?
>
> Poulos: No, I don't need it that bad.

After that verbal exchange, Agent Mason paid Artman $400.00 for the .22 caliber silencer-equipped pistol and then asked Poulos, "and what do you want to take care of you for now until he gets you another one?" Poulos responded, "whatever you feel ... I can't do anything." Agent Mason then asked, "Is 100 all right?" Poulos answered, "It's all right," and he took the $100.00.

Poulos maintains that undercover Agent Mason instigated Poulos' "possession" by offering him one hundred dollars for the pistol and that Agent Mason cannot be the person who creates the dominion and control necessary to sustain Poulos' conviction for possession of the illegal firearm. While Poulos attributes his acceptance of the $100 to greed and characterizes the pistol transaction between Artman and Mason as a done deal prior to his being consulted and offered one hundred dollars, we nonetheless find that based upon the tape recording of the June 4th meeting and the testimony of Agent Mason and Artman, who testified that the $100 was "definitely" paid for Poulos allowing Mason to take the pistol, constructive possession was demonstrated. Poulos' recorded statements that he might let Mason use the weapon, that "we can work it out" in response to Agent Mason's desire for the weapon, and Poulos' acceptance of one hundred dollars as compensation until Artman could deliver another weapon, all entitled a jury to find that Poulos exercised the necessary dominion over the weapon to establish his constructive possession of an illegal firearm.

## IV.

Poulos further contends that his conviction for possession of two silencer

kits, which were neither properly registered nor identified by serial numbers, resulted from the operation of an *ex post facto* law defining the term "silencer" as applied to him, and that the silencer component parts found in his basement did not constitute firearms within the meaning of the National Firearms Act. 26 U.S.C. § 5812(a) *et seq.*

Prior to amendment on May 19, 1986, the definition of firearm included "(7) a muffler or a silencer for any firearm." 26 U.S.C. § 5845(a)(7). The term "silencer," however, was not defined until May 19, 1986, when the definition of silencer was finally codified:

> The terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication. 18 U.S.C. § 921(a)(24).

Since Poulos obtained the silencer componentry in 1984, he asserts that his possession of the silencers was not criminal until 18 U.S.C. § 921(a)(24) provided a statutory definition of the term "silencer" in 1986.

We find no merit in Poulos' assertions. As noted by the district court, even assuming that Poulos lawfully possessed component parts to silencers in 1984 prior to the application of 18 U.S.C. § 921(a)(24), the 1986 amendment which defined the term "silencer," Poulos was convicted for his possession of the silencer component parts in 1987, well after 18 U.S.C. § 921(a)(24) was enacted. Thus, like *Samuels v. McCurdy*, 267 U.S. 188, 45 S.Ct. 264, 69 L.Ed. 568 (1925), wherein the Court rejected the argument that possession of liquor which antedated prohibition could not be made illegal, we find that Poulos' conviction for his 1987 possession of the silencers, coming one year after § 921(a)(24) specifically defined the term silencer, does not impact upon his 1984 possession of the silencer component parts. As the Court stated in *Samuels v. McCurdy*, 267 U.S. 188, 45 S.Ct. 264, 69 L.Ed. 568 (1925):

> This law not an ex post facto law. It does not provide a punishment for a past offense. It does not fix a penalty for the owner for having become possessed of the liquor. The penalty is imposed for continuing to possess the liquor after the enactment of the law. *Id.* at 193 [45 S.Ct. at 265].

Thus even if upheld solely pursuant to 18 U.S.C. § 921(a)(24), Poulos' conviction does not raise the specter of the operation of an *ex post facto* law.

■ Moreover, regardless of the applicability of 18 U.S.C. § 921(a)(24), the possession of unregistered silencers, or of silencers without serial numbers, has been prohibited since 1968. Gun Control Act of 1968, § 201 Pub.L. No. 90–618 (codified as amended at 26 U.S.C. § 5861). While the term "silencer" was not expressly defined until 26 U.S.C. § 5845(a)(7) was amended by 18 U.S.C. § 921(a)(24) in 1986, prior to the amendment codifying a definition of "silencer," both the Ninth Circuit and First Circuit held that the possession of a silencer's component parts that were readily available and required only a brief and minimal effort for assembly constituted an illicit firearm under 26 U.S.C. § 5845. *United States v. Luce*, 726 F.2d 47, 48–49 (1st Cir.1984); *United States v. Endicott*, 803 F.2d 506, 508–09 (9th Cir.1986).

We find that although Poulos maintains that the silencer component parts discovered in his basement do not satisfy the *Luce* test, substantial evidence compels a contrary conclusion. Agent Richard Craze of the Bureau of Alcohol, Tobacco and Firearms (ATF) testified that from the silencer components found in Poulos' basement, he assembled two functional silencers that were originally manufactured for use on a Mac–Ingram submachine gun. As to the first "item," Craze testified that he "merely threaded the two halves together," and tested the silencer on a .22 caliber Ruger pistol.[4] The results of the test indicated a

---

**4.** Agent Craze added that he tested the silencer devices with a .22 caliber pistol instead of with a nine millimeter weapon, such as a Mac–10 submachine gun, because as to the difference in the

10 decibel reduction when the weapon was fired with the silencer device fitted. Agent Craze then testified that for the second item tested, he utilized "just the forward half of the Sionics silencer," and a 10 decibel reduction was again registered. Thus, the component parts tested significantly "diminished the report of a portable firearm," 18 U.S.C. § 921(a)(24), and based upon the testimony of Agent Craze, the component parts were readily available and required only a brief and minimal effort for assembly, thus satisfying the *Luce* test. *See Luce* at 48–49.

While some confusion appears to have arisen on the cross-examination of Agent Craze as to the ease of assembly of the component parts for the second silencer device tested, we find that although only the forward end of a silencer was tested in the second instance and that device was tested on a .22 caliber pistol for safety purposes, the fact that some additional modifications may have been necessary to fabricate a "safe" silencer for a nine millimeter weapon does not detract from the evidence produced that demonstrated that both devices tested, a complete silencer and the front end of a silencer, both produced considerable decibel reductions when a firearm was tested. Accordingly, although further modification may have produced even greater decibel reductions, sufficient evidence was provided in the testimony of Agent Craze to conclude that the silencer component parts discovered were, without modification, readily available and assembled with only a brief and minimal effort, *see Luce*, and in such unmodified form, capable of producing a sufficient enough decibel reduction to constitute classification as silencers.

## V.

■ Poulos' final contention on appeal is that the silencer kits seized from his basement on June 7, 1987, should have been suppressed since the incriminating nature

of the silencer component parts was not "immediately apparent" as required to uphold a seizure under the plain view exception to the fourth amendment's warrant requirement. *See Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

To uphold the seizure of the silencer component parts pursuant to the plain view doctrine, the government must demonstrate: (1) a prior valid intrusion, (2) inadvertent discovery, and (3) that it was immediately apparent that the item in plain view was evidence of a crime. *Texas v. Brown*, 460 U.S. 730, 736, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983); *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971); *United States v. Truitt*, 521 F.2d 1174, 1176 (6th Cir.1975).

The parties do not dispute that the first two requirements of the plain view exception were satisfied in the case at bar. The searching officers had a valid warrant which authorized the seizure of financial records, but not silencers or silencer component parts, and in the course of the admittedly valid search on June 7, 1987, IRS Special Agent Salak inadvertently discovered the silencer component parts when he searched boxes in Poulos' basement. The precise issue presented, therefore, is whether it was immediately apparent to the searching agents that the silencer component parts discovered were evidence of unlawful activity. *See Coolidge*, 403 U.S. at 466, 91 S.Ct. at 2038; *United States v. Szymkowiak*, 727 F.2d 95, 99 (6th Cir. 1984).

■ The "immediate" determination of an object's criminality requires that "the executing officers can *at the time* of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature." *United States v. Beal*, 810 F.2d 574, 577 (6th Cir. 1987); *Szymkowiak*, 727 F.2d at 95. As to

discharge of gas between a .22 caliber firearm and a nine millimeter weapon, the completed silencer tested in the first instance could be safely tested on a 9 millimeter weapon, but when testing just the forward section of the

Sionics type silencer, as accomplished in the second test, the amount of gas discharged would have presented a safety hazard and thus, a .22 pistol was instead used.

the second prong, the criminality of an item is "apparent" if the intrinsic nature or appearance of the seized object provides probable cause to believe that the object is associated with criminal activity.[5] *United States v. McLernon*, 746 F.2d 1098, 1125 (6th Cir.1984); *Szymkowiak*, 727 F.2d at 99; *Beal*, 810 F.2d at 577.

In concluding that the silencer component parts seized were, by their very nature, intrinsically suspicious, and that their criminality was immediately apparent, we find that in the hands of private individuals, silencers, like sawed-off shotguns, are not "intrinsically innocent" objects and their possession is a serious crime except under "extraordinary circumstances." *See Porter v. United States*, 335 F.2d 602, 607 (9th Cir.1964), *cert. denied*, 379 U.S. 983, 85 S.Ct. 695, 13 L.Ed.2d 574 (1965). A properly registered silencer is not illegal, but as with a sawed-off shotgun, "its lawful possession is, in ordinary experience, rare indeed." *United States v. Truitt*, 521 F.2d 1174, 1177 (6th Cir.1975). As noted in *United States v. Padilla*, 819 F.2d 952, 962 (10th Cir.1987), "[s]ilencers are not used in recreational pursuits but are usually associated with the use of guns in criminal endeavor." Moreover, "a readily and easily assembled silencer serves no innocent purpose but is designed to facilitate the killing of another or to effectuate some other pernicious purpose by reducing the noise level of a fired weapon." *Luce* at 49. Thus, under the circumstances wherein Agent Salak immediately recognized the items found in the box to be two silencers and their internal parts, and furthermore, the searching agents were aware of the significance of the silencers in the context of the overall investigation[6], we find that like the inadvertent discovery of sawed-off shotguns pursuant to the plain view doctrine, *see Truitt*, the silencer component parts seized were "intrinsically suspicious," and their incriminating nature was immediately apparent to the searching officers.

In support of his contention that the silencers were not properly seized pursuant to the plain view doctrine, Poulos relies upon *United States v. Szymkowiak*, 727 F.2d 95, 98–99 (6th Cir.1984), and *United States v. Beal*, 810 F.2d 574 (6th Cir.1987).

In *Szymkowiak* this court held that the seizure of an AR–15 assault rifle during the execution of a warrant for items of stolen property was unlawful. The searching officers at the time of discovery could not determine whether the rifle was automatic and consequently whether its possession was unlawful. Even after other agents arrived on the scene, the legality of the weapon could not be determined without disassembling the rifle to see if it had been illegally adapted into a fully automatic weapon requiring registration. Thus, *Szymkowiak*'s criminality was not immediately apparent to the searching officers from their plain view of the seized weapon.

In *Beal*, while executing a search warrant for stolen property, a searching agent discovered two unusually heavy fountain pens. The "pens" were given to an FBI agent and later to an ATF agent who upon disassembling the pens discovered that they were .22 caliber pen guns. This court found that at the time of discovery, probable cause of the "pens'" incriminating nature was neither immediate nor apparent. *Id.* at 577.

---

**5.** As prescribed in *United States v. Szymkowiak*, 727 F.2d 95 (6th Cir.1984) (*citing United States v. Gray*, 484 F.2d 352 (6th Cir.1973), *cert. denied*, 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974)), to satisfy the "immediately apparent" test in the context of a seizure made pursuant to the plain view doctrine, searching officers would have probable cause to seize an item only if the intrinsic nature of the object seized were incriminating. *See Szymkowiak* at 99. Otherwise, the executing officers would not have probable cause to believe that the required nexus between the viewed item and criminal activity existed. *See Szymkowiak* at 97.

**6.** In determining whether the items seized constitute evidence of a crime, the collective knowledge of the searching officers can be considered. *United States v. Newton*, 788 F.2d 1392 (8th Cir.1986), *cert. denied*, — U.S. —, 109 S.Ct. 841, 102 L.Ed.2d 973 (1989); *United States v. Johnston*, 784 F.2d 416 (1st Cir.1986). ATF Agent Morrissey testified that he was aware on June 7th that on June 4th a silenced .22 caliber pistol had been sold to an undercover agent and that on June 7th a MAC–10 silencer had been shipped by UPS.

We find, however, that *Szymkowiak* and *Beal* are distinguishable from the case at hand and that instead the case at bar is controlled by *United States v. Truitt*, 521 F.2d 1174 (6th Cir.1975). In *Truitt*, in the course of the execution of a search warrant for gambling materials in a sporting goods store, officers inadvertently discovered a sawed-off shotgun. Recognizing that a sawed-off shotgun is rarely properly registered or put to legitimate use, the weapon was seized and suppression was denied even though found in a sporting goods store, a location wherein legal firearms were more likely to be found than in Poulos' basement.

Consequently, in distinguishing *Szymkowiak* and *Beal* from the instant case, we find that based upon their knowledge of the underlying investigation, the searching agents in the case at bar had probable cause to believe that a nexus existed between the silencer kits and criminal activity. *See Szymkowiak* at 97. Moreover, having concluded that the searching officers did have probable cause to believe from the intrinsic nature of the seized silencer component parts that the evidence was incriminating, a situation unlike *Beal* or *Szymkowiak* wherein the criminality of the items discovered was not immediately apparent since disassembly was required to establish the criminality of the objects and the items were not "intrinsically incriminating," we conclude that our decision does not conflict with precedent in this circuit.

In further support of his contention that it was not immediately apparent that the silencer kits were criminal objects, Poulos focuses upon Agent Salak's conduct after his discovery of the box containing silencer component parts. Instead of immediately physically seizing the silencer component parts, an ATF Agent (Agent Morrissey) was called to the scene and he was the one who examined the silencer kits and con-

cluded that the silencer component parts lacked serial numbers in violation of federal law.[7] At the suppression hearing, however, Agent Salak testified that upon his initial discovery of the box in Poulos' basement, he immediately recognized the contents of the container to be silencer parts. Indeed, it was as a result of the searching agent's recognition of the incriminating nature of the silencer component parts that ATF Agent Morrissey was consulted. We find no infirmity in Agent Salak's conduct whereby an ATF Agent was consulted and confirmed Agent Salak's well-founded suspicion, a belief supported by probable cause given the nature of the seized items, that the silencer component parts were illegal.

## VI.

For the foregoing reasons, we affirm Poulos' conviction.

---

7. Based upon viewing the silencer componentry, ATF Agent Morrissey determined that the silencer component parts were in violation of the National Firearms Act and the Gun Control Act of 1968 because the parts were defined as firearms under the law, and based upon an examination of the componentry, the serial numbers required by law to be affixed to the componen-

try were not discovered. Thus, unlike *Szymkowiak* and *Beal* wherein the criminality of objects could be determined only after the items were disassembled, the criminality of the silencer component parts seized in Poulos' basement was immediately apparent to searching officers based upon a cursory visual inspection of the evidence.