941 F.2d 1210
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
George Lee MARTIN, Defendant-Appellant.
 No. 90-6318.
 United States Court of Appeals, Sixth Circuit.
 Aug. 19, 1991.
 
 Before KEITH and BOGGS, Circuit Judges, and RUBIN, District Judge.*
 PER CURIAM.
 
 
 1
 Martin entered a conditional guilty plea to being a felon in possession of ammunition, and he was sentenced to 16 months of imprisonment. After being charged, Martin moved to suppress evidence as being illegally seized. The motion was denied, and Martin agreed to plead guilty, so long as he reserved the right to appeal the fourth amendment issue. He now renews the argument that he made at the suppression hearing. We affirm the decision of the district court denying Martin's motion to suppress evidence on fourth amendment grounds.
 
 
 2
 * This case arises out of a joint investigation of Martin by the F.B.I. and the local Tennessee police. The police observed Martin driving his car with stolen license plates, and they procured a warrant for his arrest. On December 19, 1989, the police went to arrest him. After a certain amount of searching, the police managed to discover that he lived at 1200 N. Chester, Apt. 1.[1] Although armed with an arrest warrant, the police began by using an approach that was at least a little bit subtle. They tried to lure him out of the apartment by sending a police officer to knock on the door. Joyce Endsley, Martin's former girlfriend, answered the door. The officer, knowing full well the answer, asked whose car was outside the door. The officer told her that he had scraped against the car, and that he wanted to speak with the owner to give him the relevant personal information and to settle the problem. Rather than call Martin, Endsley came outside to ask for the information.
 
 
 3
 Having found that the subtle approach was not going to be successful, the police tried the direct approach. Just as Endsley reentered the house, several police cars drove up. A number of police officers jumped from their vehicles and approached the house, many clad in raid jackets, and all armed. At this point, she spoke again with the police. She again insisted that Martin was not at the house. It is at this point that the police version and Ms. Endsley's version diverge.
 
 
 4
 The police claim that, at that point, F.B.I. agent Bradley Garrett read her a copy of the "consent to search form." According to the police, she then generously agreed to sign the form. The form itself gives permission to execute a "complete" search of the area, and to seize "any letters, paper, materials or other property which they may desire." The police version is that she signed this version prior to the start of the search.
 
 
 5
 She claims that the police were somewhat less fastidious. She claims that the police, after asking if Martin was there, asked if they could look for him. She says that she gave the police permission, at that point, to search the house for Martin. She denies being read out loud the consent to search form or agreeing to an extensive search. She does claim, however, that the police gave her a form to sign at the end of the search, telling her that the form was a receipt for some items that they took with them.
 
 
 6
 There is some evidence that would tend to corroborate Endsley's version, however. Garrett, the F.B.I. agent who accompanied the local police, testified that the search began about 9:30 p.m. The form, however, listed the time as 9:50 p.m. It is possible that Garrett recalls the time incorrectly, or that the form was filled out incorrectly. It is also possible, however, that both the form and his testimony are correct about the time and that Endsley's testimony is accurate. In addition, the police claim that Endsley filled out two forms--a consent form prior to the search and a receipt after the search. The government has not, however, produced the second form. Martin asks us to infer from this that they are lying, that there never was a second form.
 
 
 7
 In any event, it is clear that the police did enter the apartment to search for Martin. During the course of the search, the police saw, in plain view, some stolen license plates, which they seized at that point. While searching a closet in a bedroom occupied by Martin, Officer Ricky Roll saw a green box on the floor that he recognized as an ammunition box.[2] At that point, Officer Roll looked inside the box. He saw bullets. The police also saw, in plain view, a white box with the word "ammunition" on the side. For some reason, the police did not open this one.
 
 
 8
 The police managed to arrest Martin more than a month later, in February 1990. At that point, he admitted that he still had the ammunition in his room. On March 5, 1990, the police obtained a federal search warrant. They searched the house, including his room, on March 7, and they found ammunition.
 
 II
 
 9
 Martin begins with the proposition that fraud or trickery in obtaining consent renders a search invalid. Martin alleges that the police gave Endsley the consent form after leaving the house, and tricked her into signing it. Consent can be obviated by fraud, duress, or trickery. See United States v. Buchanan, 904 F.2d 349, 355 (6th Cir.1990); United States v. Turpin, 707 F.2d 332, 385 (8th Cir.1983). Even on Endsley's version of events, however, she voluntarily consented to allow the police to search her apartment. Martin's argument, therefore, can only go to the scope of the search rather than to its basic legality.
 
 
 10
 "The scope of a consent search is limited by the breadth of the consent itself." United States v. Gay, 774 F.2d 368, 377 (10th Cir.1985). The government maintains that the scope of the consent was unlimited, while Martin claims that Endsley only consented to a search for Martin himself. We need not resolve this issue, however. Even assuming, arguendo, that Endsley's version is true, we believe that the search would, in this case, be legal.
 
 
 11
 When police are on a premises legally, they can seize evidence in "plain view." See Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535 (1983); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022 (1971). The elements of a "plain view" search or seizure are "(1) a prior valid intrusion, (2) inadvertent discovery, and (3) that it was immediately apparent that the time in plain view was evidence of a crime." United States v. Poulos, 895 F.2d 1113, 1121 (6th Cir.1990). The first two elements are not in serious dispute. Even under Endsley's version, the police were in the room legally, and a closet, such as the one in which the police found the green ammunition box, is certainly a place where one might find a person hiding. Nor is there any indication that the police expected to find ammunition.
 
 
 12
 "Plain view" is not, however, a talisman that the police can invoke in order to ward off any constitutional scrutiny. The teaching of Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149 (1987), is that the "plain view" doctrine does not justify a cascading series of intrusions. In Hicks, the police lawfully entered a home to investigate a gunshot that had been fired through the floor of the apartment-dweller's apartment. Id. at 323, 107 S.Ct. at 1151. The police officers saw, in the apartment, some Bang and Olufsen stereo equipment that "seemed out of place in the squalid and otherwise ill-appointed four-room apartment." Id. at 323, 107 S.Ct. at 1152. Consequently, one officer read and recorded their serial numbers. But, in order to do so, the officer had to move some of the stereo components, including the Bang and Olufsen turntable. Ibid. The Court held that looking under the turntable was a search. "A search is a search, even if it happens to disclose nothing but the bottom of a turntable." Id. at 325, 107 S.Ct. at 1153. Thus, in order to justify their actions, the police had to show probable cause, at the time of the search, to seize the object seen in plain view Id. at 326-329, 107 S.Ct. at 1153-54.
 
 
 13
 Opening a box, even more than looking under a stereo, is a search. Thus, in order to justify its action, the government had to demonstrate probable cause, existing at the time of the search. Accordingly, the issue is whether it was "immediately apparent" that the box was evidence of illegal activity. We believe, under these circumstances, that it was. "The criminality of an item is 'apparent' if the intrinsic nature or appearance of the seized object provides probable cause to believe that the object is associated with criminal activity." Poulos, 895 F.2d at at 1122. In making this determination, we look at the collective knowledge of the police. Id. at 1122 n. 6. In making this determination, the police cannot exceed the scope of their legitimate initial presence in a particular location. United States v. Beal, 810 F.2d 574, 577 (6th Cir.1987).
 
 
 14
 We have not hesitated to hold that suppression was necessary when the knowledge of the police was inadequate, at the time, for police to believe that the object was somehow associated with criminal activity. For example, in Beal we held that an inspection of two pens that turned out to be .22 caliber pen guns was not supported by probable cause because there is no inherent connection between innocent-looking pens and criminal activity. Ibid. We reached a similar conclusion in United States v. Szymkowiak, 727 F.2d 95 (6th Cir.1984), where the police seized a Colt AR-15 rifle that had been converted from semi-automatic to full-automatic. We reasoned that, at the time of the seizure, the police had no reason to believe that the weapon had been converted to full-automatic, the characteristic that made its possession criminal. Id. at 99. Nonetheless, we have upheld seizures, such as the one in Poulos involving silencer parts, whose connection to criminality was immediately apparent to a knowledgeable observer. Poulos, 895 F.2d at 1122.
 
 
 15
 This principle applies even where the object at issue is not itself contraband, but is, rather a container for contraband. If the container is in plain view, and the police have probable cause to believe that it contains contraband, the search or seizure is constitutionally acceptable. Thus, in United States v. Morgan, 744 F.2d 1215 (6th Cir.1984), we upheld a conviction where DEA agents searched bottles with the name of the drug on their label. Although our opinion in that case was not as clear as it might have been, we read the panel to say that the label, on an object in plain view, constituted probable cause to conduct a search or a seizure. We note that other circuits have upheld searches based on sense data from senses other than sight. See, e.g., United States v. Ocampo, 650 F.2d 421, 429 (2d Cir.1981) ("plain touch"); United States v. Lueck, 678 F.2d 895, 903 (11th Cir.1982) ("plain smell"). In each case, the sensory information implied, with a high but not total degree of certainty, the necessary criminal connection. We think that the fact that the box searched was recognizably an ammunition box was the functional equivalent of a label. The nature of the contents were therefore revealed to the police with a high degree of probability.
 
 
 16
 The police knew that Martin was a felon, and thus legally precluded from possessing ammunition. The police saw two boxes, one with the word "ammunition" on it, another that was recognized by the police officer on the scene as being an ammunition box. We believe, based on this evidence, that the connection of the ammunition boxes with criminal activity was both "immediate" and "apparent." Even if empty, the boxes would constitute evidence that he had possessed ammunition. To be sure, an ammunition box might be used to store cookies, just as a cookie jar can be used to store ammunition. But the strong probabilities are that an ammunition box contains ammunition, just as most cookie jars contain cookies. Thus, we believe that the police legally could seize the box, at that point. The Court made it clear in Hicks that probable cause for a seizure is a fortiori probable cause for a search. Hicks, 480 U.S. at 326, 107 S.Ct. at 1153. Accordingly, we hold that the search of the green ammunition box did not violate Martin's constitutional rights.
 
 III
 
 17
 The decision of the district court denying Martin's motion to suppress evidence is AFFIRMED.
 
 
 
 *
 The Honorable Carl B. Rubin, United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 The "apartment" that Martin lived in was a house that had been subdivided into two separate units, rather than a part of a larger complex built as an apartment building
 
 
 [2]
 The closet was large enough to hide in, so looking in the closet for Martin could be reasonable