949 F.2d 397
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Elmer S. EDWARDS, Defendant-Appellant.
 No. 91-5230.
 United States Court of Appeals, Sixth Circuit.
 Dec. 5, 1991.
 
 On Appeal from the United States District Court for the Eastern District of Kentucky, No. 89-00076; Bertelsman, D.J.
 E.D.Ky.
 AFFIRMED.
 Before: RYAN, Circuit Judge; WELLFORD, Senior Circuit Judge; and JAMES HARVEY, Senior District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 Defendant, Elmer S. Edwards, appeals his jury convictions for conspiracy to commit armed robbery, in violation of 18 U.S.C. § 371; aiding and abetting the interstate transportation of stolen motor vehicles, in violation of 18 U.S.C. §§ 2312 and 2; aiding and abetting the receipt of stolen motor vehicles, in violation of 18 U.S.C. §§ 2313(a) and 2; aiding and abetting in armed bank robbery, in violation of 18 U.S.C. §§ 2113(a), (d) and 2; and aiding and abetting the use of firearms in the commission of a crime, in violation of 18 U.S.C. §§ 924(c) and 2. Edwards raises the following issues on appeal:
 
 
 2
 1. Whether the district court abused its discretion in admitting the testimony of the government's witnesses; and
 
 
 3
 2. Whether the district court erred by admitting the in-court identification testimony of Edwards by a witness who came forward to testify after seeing Edwards' picture in a newspaper article.
 
 
 4
 We conclude that the district court did not err by admitting the challenged testimony, and we shall, therefore affirm Edwards' convictions.
 
 I.
 
 5
 On September 25, 1989, four armed men wearing costume masks robbed the Huntington Bank of Kenton County in Edgewood, Kentucky. The gunmen left the bank with over $107,000; included with this money were five dye packs designed to explode when activated. The gunmen fled in a blue van, drove to a shopping center lot, switched cars, and left in a two-tone sedan. They then drove to another shopping center lot, parked, split up, and entered two different cars. A witness noted the license plate number of one of the two cars, a blue Pontiac.
 
 
 6
 State investigators recovered the blue van, the two-tone sedan, and a third car, a bronze sedan they found abandoned in direct line of sight of the bank. All three vehicles had been reported stolen in the week prior to the robbery.
 
 
 7
 The Federal Bureau of Investigation traced the blue Pontiac, and agents began surveillance at the apartment of the car's owner, Marcella Jones. Agents observed the delivery of a television set to Jones' apartment, and discovered that the television set had been purchased with cash stained by red dye. The agents then obtained and executed a search warrant for the apartment. They found additional dye-colored money, and interviewed Jones and her companion, Rodney Starkey. Starkey agreed to cooperate with the investigation and act as a confidential informant in return for immunity. Starkey admitted participating in the robbery, and identified Billy Gaston, J.C. Adams, and Elmer Edwards as the other gunmen. He also identified Jerry Kidwell as the thief of the blue van and the bronze sedan. Finally, Starkey described a plan, then in formation, to rob an armored car in Covington, Kentucky.
 
 
 8
 Based on Starkey's information and his continuing cooperation as a confidential informant, agents began surveillance of the intended crime site in Covington, an intersection where three banks are located. On December 1, 1989, agents observed a car driven by Gaston and another man, Wayne McGinnis, repeatedly drive by the intersection. On December 4, 1989, Adams robbed a bank in Knoxville, Tennessee, and was apprehended the same day. Also on December 4, Starkey met with Gaston. Gaston introduced Starkey to McGinnis, and advised Starkey that McGinnis would take Adams' place in the armored car robbery. Starkey informed agents that the armored car robbery was imminent.
 
 
 9
 On December 8, agents again placed the Covington intersection under surveillance. They observed Gaston and McGinnis repeatedly drive by the intersection, and then saw the two pick up Edwards near the intersection. Agents then stopped the car, arrested the three men, and found a loaded gun in the car. Edwards was carrying ammunition and false identification. The arrest led to searches of a trailer home occupied by Edwards and a storage unit leased by Gaston. The searchers discovered ammunition, weapons, and masks of the type used in the bank robbery.
 
 
 10
 On December 13, Kidwell was arrested and agreed to cooperate. Also on December 13, Edwards and five codefendants--Gaston, Adams, Kidwell, McGinnis, and Edwards' son, Matthew Edwards--were indicted for the bank robbery and the planned armored car robbery.
 
 
 11
 Following the indictment, on December 14, 1989, the Kentucky Post published pictures of Edwards, Gaston, Adams, Kidwell, and Edward's son. June Hedger, later a government witness, upon seeing the newspaper story and recognizing Edwards' photo, contacted the Federal Bureau of Investigation. She reported that she had seen Edwards and a younger man at the Huntington Bank at 9:30 p.m. on September 22, 1989, three days before the robbery. She said she saw Edwards walk around the closed bank and peer inside, and she informed him that the bank was closed. Edwards, without responding, got into his car and drove away.
 
 
 12
 By the time of Edwards' trial, all codefendants had entered guilty pleas. Adams, Kidwell, and McGinnis testified for the government at Edwards' trial, along with unindicted co-conspirator Starkey. Adams and Starkey testified about the details of the bank robbery and the plans for the armored car robbery, testimony that included a description of Edwards' role in both. Kidwell testified that in September 1989, Edwards, Gaston, Starkey, and a fourth man paid him to steal the blue van and bronze sedan used in the bank robbery. He also testified that in November 1989 Gaston solicited him to steal vehicles for use in the armored car robbery. McGinnis testified that Gaston had recruited him for the armored car robbery, and that during the planning of the robbery he met Edwards.
 
 
 13
 At the conclusion of the government's case, the district court, over Edwards' objection, admitted the testimony of government witnesses Starkey, Kidwell, and Adams, each of whom testified to out-of-court statements that implicated Edwards in the conspiracy. The district court based its ruling on a finding that there was proof of a conspiracy and that Edwards was a co-conspirator.
 
 
 14
 Prior to trial, defendant Edwards and Matthew Edwards, his son, moved to suppress Hedger's eyewitness identification of them at the bank. By order of a magistrate judge, this motion was denied. Codefendant Matthew Edwards then pleaded guilty. Defense counsel renewed the motion at trial, immediately prior to Hedger's testimony, and it was denied. Hedger then identified Edwards as the man she saw at the Huntington Bank three days before the robbery.
 
 
 15
 Another witness, a bank teller, identified a mask found in Edwards' trailer as the mask worn by one of the gunmen during the bank robbery.
 
 II.
 A.
 Proof of Conspiracy
 1.
 Admission of Co-conspirators' Statements
 
 16
 Edwards argues that this court should reverse his convictions because the district court improperly admitted testimony of Starkey, Kidwell, and Adams that related statements made by co-conspirators implicating Edwards in the robberies.
 
 
 17
 Starkey testified to statements made by Kidwell about the group's plans to use stolen vehicles and to statements made by Gaston describing the armored car robbery. Adams testified to statements made by Gaston, Edwards, and Starkey about the details of the plan to rob the bank, and to statements made by Gaston about the plan to rob the armored car. Kidwell testified to statements made by Gaston about the bank robbery, including requests of Kidwell to steal cars, identification of the group's members, and a description of the details of the bank robbery. Kidwell also testified to statements made by Gaston to Kidwell about the armored car robbery. These statements included asking Kidwell to steal a van, describing the plan to rob the armored car, and relating the names of the group. The district court received all of the foregoing statements pursuant to Fed.R.Evid. 801(d)(2)(E).
 
 
 18
 Edwards contends that there was not sufficient proof of the existence of a conspiracy to justify admitting the otherwise hearsay statements.
 
 Under Fed.R.Evid. 801(d)(2)(E):
 
 19
 A statement is not hearsay if--
 
 
 20
 ....
 
 
 21
 ... The statement is offered against a party and is ... (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.
 
 
 22
 The requirements of Fed.R.Evid. 801(d)(2)(E) for the admissibility of the statements of a co-conspirator are proof, by a preponderance of the evidence, that (1) a conspiracy existed, (2) the defendant against whom the statement is offered was a member of the conspiracy, and (3) the statement was made in the course and in furtherance of the conspiracy. United States v. Vinson, 606 F.2d 149, 152 (6th Cir.1979), cert. denied, 444 U.S. 1074 (1980). Accord United States v. Enright, 579 F.2d 980, 986 (6th Cir.1978). If these three requirements are satisfied, the statements of the out-of-court declarant are treated as vicarious admissions of the defendant, rendering them "not hearsay" under Rule 801 and thus admissible.
 
 
 23
 As explained in Vinson, 606 F.2d at 153, a trial court, in its discretion, may admit the out-of-court statements at any one of three stages in the trial. The court may
 
 
 24
 choose to admit the hearsay (a) after the government has established the conspiracy by a preponderance at the trial, or (b) at a "mini-hearing," or (c) conditionally subject to connection....
 
 
 25
 In this case, the district court used the third method described in Vinson and conditionally admitted out-of-court statements by Kidwell, Gaston, Edwards, and Starkey as related during the testimony of several government witnesses. The "condition" to which the admission of the out-of-court declarations were "subject" was proof of the underlying conspiracy.
 
 
 26
 This court has held that a criminal conspiracy can be proven either by direct evidence or circumstantial evidence, and that once a conspiracy is established, only "slight evidence" is necessary to implicate a defendant. United States v. Poulos, 895 F.2d 1113, 1117 (6th Cir.1990).
 
 
 27
 In this case, the government introduced substantial proof of the existence of a conspiracy. Witnesses Starkey, Adams, Kidwell and McGinnis implicated Edwards in the schemes to rob the Huntington Bank and the armored car. Their testimony was that Edwards was involved in all aspects of the planning, including the decision to steal cars for use in both robberies, the assigning of specific roles to each perpetrator for the bank robbery, and the detailed planning of the aborted armored car robbery. In addition, the government proved that Edwards possessed false identification and a mask like the type used in the bank robbery, and that he was present at the Huntington Bank three nights before the robbery.
 
 
 28
 Given the abundance of evidence proving that Edwards participated in the conspiracy to rob the bank and the armored car, we hold the trial court did not err in admitting the out-of-court statements by Edwards' co-conspirators.
 
 2.
 Credibility of Government Witnesses
 
 29
 Edwards also contends that this court should reverse his convictions because the testimony of Adams and Starkey was "not trustworthy" and should not have been considered by the jury.
 
 
 30
 Edwards argues, first, that Adams was not reliable because he had been previously convicted of felonies and was evasive. This argument misunderstands the difference between the sufficiency and the quality of evidence. This court has held that "attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence." United States v. Adamo, 742 F.2d 927, 935 (6th Cir.1984), cert. denied, 469 U.S. 1193 (1985). After a conviction, appellate courts are precluded from assessing the witnesses' credibility. Id. Here, the jury found the government's witnesses to be credible. This court is without authority to second-guess the jury's judgment on that score.
 
 
 31
 Edwards argues, second, that Starkey's testimony may have been unduly influenced when the government assured Starkey that it would not prosecute him if he would cooperate. Edwards cites the Eighth Circuit's holding in United States v. Waterman, 732 F.2d 1527 (8th Cir.1984), cert. denied, 471 U.S. 1065 (1985), for the proposition that the due process rights of a defendant may be violated if the government's lenient treatment of a witness is contingent upon the results of the trial in which the witness testifies. The opinion in Waterman was subsequently vacated, however, following an en banc vote, id. at 1533, and thus has no precedential value, even within the Eighth Circuit. See United States v. Spector, 793 F.2d 932, 936 (8th Cir.1986), cert. denied, 479 U.S. 1031 (1987).
 
 
 32
 More importantly, there is no evidence that leniency toward Starkey was contingent upon the success of the prosecution of Edwards. Rather, trial testimony revealed that the case agent required only that Starkey testify truthfully. Nothing was adduced about an agreement to make his immunity from prosecution contingent upon the success of the prosecutions against Edwards.
 
 
 33
 Where there is no incentive or contingency arrangement, even the considerations discussed in Dailey and in Waterman do not apply and there is no occasion to prevent or question the use of such testimony.
 
 
 34
 United States v. Betancourt, 838 F.2d 168, 175 (6th Cir.), cert. denied, 486 U.S. 1013 (1988).
 
 
 35
 Here, the credibility of the government's witnesses was a matter for the jury, and the evidence did not indicate that leniency toward Starkey was conditioned on the outcome of the trial in which he testified. We conclude, therefore, that the trial court did not abuse its discretion by admitting the testimony of Adams and Starkey.
 
 B.
 Admissibility of Eyewitness Identification
 
 36
 Edwards argues that this court should reverse his convictions because the district court improperly admitted Hedger's identification testimony.
 
 
 37
 There is a two-part standard of review of a district court's decision on a motion to suppress evidence: Findings of fact are upheld unless clearly erroneous standard, and conclusions of law are reviewed de novo. United States v. Duncan, 918 F.2d 647, 650 (6th Cir.1990), cert. denied, 111 S.Ct. 2055 (1991).
 
 
 38
 Edwards contends that Hedger's identification of him is unreliable because 1) the newspaper photo of him was unduly suggestive, and 2) too much time elapsed between the night she allegedly saw Edwards at the bank and her initial identification of him after seeing the newspaper photo.
 
 
 39
 This court considered a similar challenge in United States v. Monsour, 893 F.2d 126 (6th Cir.1990). There, after a bank robbery, a teller described the robber to the police. She then viewed a photo spread that included the defendant's picture but without a beard and mustache. The witness could not positively identify the defendant. Later she saw a more recent picture of the defendant that accompanied a newspaper report linking defendant to the bank robbery. After seeing the newspaper photo, she was positive that the defendant was the robber, and later identified him at trial.
 
 
 40
 After initially noting that the threshold issue is whether the newspaper photo was "impermissibly suggestive," the court described a two-part test for use in the particular factual context:
 
 
 41
 The analysis of the "impermissibly suggestive" issue involves two inquiries. The first inquiry is whether the viewing of the newspaper photo was unduly suggestive. If so, the second inquiry is whether, under the totality of the circumstances, there was sufficient independent indicia of reliability of [the witness'] identification of [the defendant] as the bank robber.
 
 
 42
 Id. at 128 (citations omitted). Under the second inquiry, a court should examine the five factors identified in Neil v. Biggers, 409 U.S. 188 (1972). They are:
 
 
 43
 the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
 
 
 44
 Id. at 199. See United States v. Causey, 834 F.2d 1277, 1285 (6th Cir.1987), cert. denied, 486 U.S. 1034 (1988).
 
 
 45
 Applying the precedent here, it is clear that Edwards is correct in his first argument. Unquestionably, the newspaper photo was suggestive. The story ran as a front page headline accompanied by a report of the details of the bank robbery and pictures of the defendants which appeared directly under the headline on the front page. Under his picture, a caption noted that Edwards already had four convictions.
 
 
 46
 Assuming, then, that the newspaper photo was suggestive, we must examine the totality of circumstances to determine whether the identification was nonetheless independently reliable. The circumstances of the identification demonstrate a strong independent basis for Hedger's identification. She testified that when she saw Edwards at the Huntington Bank it was in an area "lit up like a Christmas tree"; that she observed Edwards for ten minutes as he walked around the bank; that she spoke to him; and that, at the time, Edwards was making no special effort to disguise himself. Hedger also gave a precise description of Edwards.
 
 
 47
 Edwards argues that the lapse of time between Hedger's alleged observation of him at the bank and her later identification demonstrates a lack of reliability. The delay was approximately three months. In Causey, this court noted that "[a] three to four-month delay between the crime and identification does not render the identification inherently unreliable." Causey, 834 F.2d at 1286 (citations omitted). Thus, the delay in this case is not fatal to Hedger's identification.
 
 
 48
 The totality of circumstances surrounding Hedger's initial viewing of Edwards at the bank provides strong indication that there was "ample independent basis for [the witness'] identification." Monsour, 893 F.2d at 128. We hold that the district court did not err in admitting Hedger's in-court identification testimony.
 
 IV.
 
 49
 For the foregoing reasons, Edwards' convictions are AFFIRMED.
 
 
 
 *
 The Honorable James Harvey, Senior United States District Judge for the Eastern District of Michigan, sitting by designation