**UNITED STATES of America,**
**Plaintiff,**

v.

**Lester LEMONS, Defendant.**

**No. 01–CR–0041.**

United States District Court,
E.D. Wisconsin.

July 30, 2001.

---

Dean A Strang, Brian P Mullins, Federal Defender Services of Eastern Wisconsin, Milwaukee, WI, for Lester Lemons, defendant.

Ray W Daniel, United States Department of Justice (ED–WI), Office of the

U.S. Attorney, Milwaukee, WI, for U.S. Attorneys.

### DECISION AND ORDER

ADELMAN, District Judge.

Defendant Lester Lemons is charged with one count of felon-in-possession of a firearm and one count of felon-in-possession of ammunition. He moves to suppress the gun and ammunition, contending that they were seized in violation of his Fourth Amendment rights because officers exceeded the scope of a permissible investigative stop and pat-down search under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Magistrate Judge Aaron E. Goodstein held an evidentiary hearing on the motion and then recommended denial. I will adopt the recommendation in part, and on different grounds. I agree with the magistrate judge that the gun is admissible. The ammunition, however, must be suppressed.

## I. GENERAL FINDINGS OF FACT

At the evidentiary hearing three West Allis police officers testified. Lemons did not present any testimony or evidence other than cross-examination of the officers. The testimony leads to the following general findings of fact.

Just before 3:00 a.m. on the morning of February 24, 2001, Lemons was involved in a two-car accident. Lemons was the only passenger in a white Ford Taurus driven by Albert Woods. Woods's car collided with a truck carrying four persons.

Three West Allis police officers arrived to investigate. Lieutenant Terry Morrissey arrived first, finding the people from the truck standing outside their vehicle and Woods and Lemons seated in the front seat of the Taurus. Woods and Lemons exited the car and walked over to Morrissey. Morrissey asked for identification, at which point Woods told Morrissey that his license was suspended.

Morrissey told all of the people involved to return to their cars while he awaited assistance. He then checked the damage to the cars, which was minor. Meanwhile, Officer Anthony Spath had arrived. Morrissey informed Spath about Woods not having a license, and Spath went to talk to Woods.

While Morrissey was surveying the damage to the truck one of its passengers, Kenneth Waara, leaned out the window and told Morrissey that before the officer had arrived Waara saw Lemons flash a gun in his waistband. Morrissey confirmed with Waara that Lemons rather than Woods was wearing the gun and discussed the type of gun Waara saw. Waara indicated that he believed the gun was an automatic handgun. According to Morrissey, Waara appeared upset about the presence of the gun, fearful for his safety, and sober.

Spath briefly talked to Woods at the Taurus, then returned to Morrissey at the truck, where he learned about the possible gun. Officer Brad Sterling then arrived, and he immediately went over to talk to Lemons, who had exited the Taurus again, about the accident. Morrissey and Spath then pulled Sterling aside to warn him about the report of a gun at the scene.

Sterling and Morrissey returned to Lemons, who was standing near the Taurus, and told him a witness had indicated Lemons had a gun on him. Lemons said he did not have a gun. Sterling said Lemons appeared intoxicated.

Spath meanwhile approached Woods, who was seated in the driver's seat; Spath advised Woods of the report of a gun and told Woods to keep his hands on the steering wheel.

At that point the following occurred, according to Sterling:

A. .... I told [Lemons] people in the other car said you had a gun.

Q. Okay. And how did he respond?

A. He said I don't have a gun.

Q. Normal? Understood you?

A. Yes.

Q. And then what happened?

A. I asked him if I could pat him down. And he said yes.

. . . . .

Q. And what happened next?

A. I started to pat Mr. Lemons down, and what I felt in his left—yeah, it would have been his left front jacket pocket, I noticed what I thought was—what felt like ammunition based on handling ammunition and being familiar with it. And I asked him if I could take what those items were out, and he said yes.

(R. 29 at 9–10.)

Morrissey did not hear Sterling ask for Lemons's consent to pat him down. Morrissey did, however, hear Sterling ask "what's this?" during the pat-down, to which Lemons responded "just bullets." (R. 29 at 39.)

Sterling then removed a sweat sock from Lemons's pocket, which contained ammunition in the form of twelve bullets. Sterling advised Morrissey and Spath that he had found ammunition but no gun.

Sterling then handcuffed Lemons and stood with him near the back of the Taurus. After Lemons was in handcuffs, Sterling ran Lemons's name through police records via the dispatcher and was told that Lemons had several outstanding warrants. Lemons was then arrested on those warrants.

After Sterling found bullets on Lemons, Officer Spath, who had just noticed a bullet on the rear passenger seat, ordered Woods out of the vehicle. Spath patted Woods down but found no weapon on him. Spath, in accord with his department's pol-icy, then placed Woods under arrest for driving without a valid license and walked Woods to the sidewalk about ten feet from the Taurus. Once Woods was out of the car, Spath returned to the car and searched it. Under and between the driver's and front passenger seat Spath saw a handgun, partially hidden inside a knit cap.

Woods and Lemons were taken to the police station. The Ford Taurus was impounded and inventoried.

## II. DISCUSSION

Magistrate Judge Goodstein recommended denial of Lemons's motion to suppress. Magistrate Judge Goodstein believed that Lemons consented to the search, that Sterling did not commit any Fourth Amendment violation in obtaining the bullets, and that the bullets provided probable cause to search the car and obtain the gun. Lemons has objected, specifically objecting to the finding that Sterling immediately recognized the items in Lemons's pocket as bullets and to the conclusion that no Fourth Amendment violation occurred in the search for and seizure of the bullets.

█ On motions to suppress, a magistrate judge may make recommendations. 28 U.S.C. § 636(b)(1)(B). A district court must review de novo the recommendations of the magistrate judge to which either party timely objects. 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b). The court may review de novo any other aspect of the recommendation as it sees fit. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). I choose to review the entire recommendation de novo.

### A. General Fourth Amendment Law

The Fourth Amendment does not invalidate all searches and seizures, but only those that are unreasonable. U.S. Const. amend. IV; *Florida v. Jimeno*, 500 U.S.

248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Searches and seizures conducted without a warrant are per se unreasonable under the Fourth Amendment, subject to some exceptions. *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). The government bears the burden of establishing by a preponderance of the evidence that a warrantless search falls within one of the exceptions. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir.2000); *see McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948). When the government fails to persuade the court that an exception applies, the evidence seized or otherwise obtained through the search must be suppressed. *Basinski*, 226 at 834.

One exception is when a person consents to a search, "because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Jimeno*, 500 U.S. at 250–51, 111 S.Ct. 1801.

Another exception was recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which held that when a police officer sees behavior that he or she reasonably believes is suspicious, the officer may briefly stop the suspicious person to inquire and may "pat-down" or "frisk" the person to check for weapons if the officer reasonably believes the person is armed and endangers the safety of the officer and others. *Dickerson*, 508 U.S. at 372–73, 113 S.Ct. 2130 (summarizing the holding of *Terry*, 392 U.S. at 24, 30, 88 S.Ct. 1868).

An exception applying to seizures, for purposes of this case supplementing the *Terry* exception, is the "plain view" doctrine. *See Horton v. California*, 496 U.S. 128, 134–36, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Simply put, officers may lawfully seize an item without a warrant if (1) they are lawfully in a position (e.g., a *Terry* stop) from which an object is in plain view, (2) the object's incriminating

character is "immediately apparent," and (3) the officers have a lawful right of access to the object itself. *Id.* at 136–37, 110 S.Ct. 2301. If, however, the first requirement is missing, and "the scope of a search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional ...." *Id.* at 140, 110 S.Ct. 2301.

Generally, evidence directly obtained from a violation of the Fourth Amendment is subject to exclusion at trial, as is any "fruit"—the indirect product—of such unlawful police conduct. *See Nix v. Williams*, 467 U.S. 431, 441, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In order for evidence obtained to be considered fruit of unlawful police conduct "the evidence must be obtained by 'exploitation' of the illegality. Evidence obtained by other means 'sufficiently distinguishable to be purged of the primary taint' may not be considered fruit of the illegality." *United States v. Gravens*, 129 F.3d 974, 978 (7th Cir.1997) (citation omitted) (quoting *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407).

Evidence obtained unlawfully thus may be admissible if it inevitably would have been discovered without reference to the police misconduct or if there is an independent source for its discovery. *Nix*, 467 U.S. at 443–48, 104 S.Ct. 2501. The government bears the burden of proving by a preponderance of the evidence that it would have been able to uncover the challenged evidence through lawful means. *Gravens*, 129 F.3d at 979–80.

I address the bullets first, because that is how the parties have framed their arguments. If the bullets are admissible Lemons essentially concedes the admissibility of the gun as well. Because I find the

bullets must be suppressed, however, I also discuss suppression of the gun.

## B. The Bullets

### 1. The *Terry* Stop and Search

The fact that a warrant is not required for a *Terry* stop and pat-down search in no way means that the Fourth Amendment does not apply; the amendment indeed does apply to investigative stops and pat-downs for weapons—they must be reasonable. *Terry*, 392 U.S. at 16–17, 19, 88 S.Ct. 1868; *see United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Evaluating the reasonableness of an investigative stop and pat-down search involves two questions: (1) "whether the officer's action was justified at its inception;" and (2) whether the officer's action "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. 1868.

### a. Justification Based on Reasonable Suspicion

█ On the first question, the officer must identify "specific and articulable facts" and resulting inferences that reasonably warrant the intrusion. *Id.* at 21, 88 S.Ct. 1868. The circumstances are judged objectively on the "reasonable suspicion" standard: whether "the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate," *id.* at 21–22, 88 S.Ct. 1868 (internal quotation marks omitted).

A police officer observing conduct suggesting that a person is committing or may commit a crime or that a person with whom he is dealing is armed is entitled, for his own and others' protection, to stop the person to inquire and "to conduct a carefully limited search of the outer clothing of such person[ ] in an attempt to discover weapons which might be used to assault him." *Id.* at 30, 88 S.Ct. 1868. Such a stop and pat-down search is reasonable under the Fourth Amendment. *Id.* at 31, 88 S.Ct. 1868.

The government bears the burden of establishing that there was reasonable suspicion to stop and pat down a suspect. *United States v. Childs*, No. 00–3111, 256 F.3d 559, 564–65 (7th Cir.2001). Reasonable suspicion may arise from information of lesser quantity than that required to establish probable cause[1] and also from information less reliable than that required to show probable cause. *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Quantity and quality of information are considered in the totality of the circumstances to determine whether reasonable suspicion exists. *Id.* While an informant's unverified tip may be insufficient for probable cause for an arrest or search warrant, it may nevertheless justify reasonable suspicion for a *Terry* stop. *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

In this case, I find that the West Allis police officers had reasonable suspicion to conduct a *Terry* search—to ask Lemons about the presence of a gun and conduct a limited search for weapons. A disinterested witness, visibly concerned for his own and others' safety, voluntarily came for-

---

1. Probable cause to search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Probable cause to arrest requires "a 'fair probability' that the person detained for questioning has committed a crime." *United States v. Raibley*, 243 F.3d 1069, 1073–74 (7th Cir.2001), *petition for cert. filed*, No. 00–10751, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d —— (June 18, 2001).

ward and informed the officers that he had actually seen Lemons with a gun before the officers arrived. The scene was the middle of the night after an accident, and the witness said Lemons had flashed the gun at the people in the truck soon after the accident occurred. For all nine persons at the scene, officers and passengers alike, the presence of a gun at the scene was extremely dangerous, and the officers would have been neglectful if they had *not* taken action to find and secure the gun. Their questioning and a limited search were justified. *See, e.g., id.* at 146–47, 92 S.Ct. 1921 (holding that information from an informant known to police, who voluntarily came forward to give information "immediately verifiable at the scene" created reasonable suspicion for a *Terry* stop).

### b. Scope of the *Terry* Search

The Fourth Amendment is violated and evidence generally excluded if the manner in which the search and seizure were conducted exceeds the proper parameters. *Terry,* 392 U.S. at 28–29, 88 S.Ct. 1868. Again, a *Terry* search based on reasonable suspicion "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer o[r] others nearby." *Id.* at 26, 88 S.Ct. 1868. If the protective search exceeds the scope necessary to determine if a person is armed, it is unconstitutional and its fruits must be suppressed. *Dickerson,* 508 U.S. at 373, 113 S.Ct. 2130.

As long as an officer stays within the scope of a *Terry* search, in addition to weapons the officer may also seize without a warrant any detected contraband, whether threatening or nonthreatening. *Id.* at 373–76, 113 S.Ct. 2130; *Michigan v. Long,* 463 U.S. 1032, 1050, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). But the officer must have probable cause to believe the item is contraband before seizing it; the probable cause requirement "ensures against exces-

sively speculative seizures." *Dickerson,* 508 U.S. at 376, 113 S.Ct. 2130.

During a *Terry* pat-down search for weapons, detection of contraband may validly occur based on plain view or the related "plain feel." *Id.* at 375–76, 113 S.Ct. 2130. Thus, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Id.* at 375, 113 S.Ct. 2130.

### i. The Squeeze

The immediate recognition of the object upon pat-down is key. The incriminating nature of the item must be immediately apparent. *Id.; United States v. Rivers,* 121 F.3d 1043, 1046 (7th Cir.1997); *United States v. Craft,* 30 F.3d 1044, 1045 (8th Cir.1994). In *Dickerson,* an officer did not immediately recognize a lump within the suspect's pocket as crack cocaine. Instead, he determined that the lump was crack only after " 'squeezing, sliding and otherwise manipulating the contents of the defendant's pocket'—a pocket which the officer already knew contained no weapon." *Dickerson,* 508 U.S. at 378, 113 S.Ct. 2130 (quoting *State v. Dickerson,* 481 N.W.2d 840, 844 (Minn.1992)). The Supreme Court affirmed the holding that the officer had exceeded the scope of a *Terry* search; the officer's "continued exploration of respondent's pocket after having concluded that it contained no weapon" went beyond the sole justification for the search, which was to protect the police and bystanders. *Id.* The search of the pocket was thus unconstitutional, as was the seizure of the crack. *Id.* at 379, 113 S.Ct. 2130.

Similar to the continued manipulation in *Dickerson,* an officer's movement and

shaking of a hard box within a suspect's pocket has been held to be beyond the scope of a *Terry* search. *United States v. Miles,* 247 F.3d 1009, 1010–11 (9th Cir. 2001). While patting down a suspect's jacket an officer could tell the item was a box rather than a weapon. The officer nevertheless wrapped his hand around the box and moved and shook it, hearing bullets rattling inside; he then seized from the pocket a cardboard box containing bullet shells. *Id.* at 1011–12. The Ninth Circuit held the search invalid. The officer

> had reached the outer limits of his pat-down authority when it was clear that the object was a small box and could not possibly be a weapon.... At that point, the officer's further manipulation of the box was impermissible. He had no cause to shake or manipulate the tiny box on the pretext that he was still looking for a weapon.

*Id.* at 1014–15. The court noted the government's argument that the officer might have been looking for a tiny knife or other small weapon, but did not consider the argument persuasive, as the testimony did not support such a motivation. *Id.* at 1015.

Similarly, an officer's inspection of the contents of a brown bag inside a suspect's jacket exceeded the scope of a *Terry* pat-down search, where the officer testified at a suppression hearing that he did not actually know the contents of the bag based on the pat-down search, but rather only when he opened the bag. *United States v. Schiavo,* 29 F.3d 6, 9 (1st Cir.1994).

On the other hand, in *Rivers,* 121 F.3d at 1046–47, the Seventh Circuit upheld the admissibility of crack cocaine found in a defendant's pocket because the officer conducted a regular pat-down search and immediately recognized the object as contraband. The district judge in that case had heard conflicting testimony—the defen-

dant testified that the officer manipulated the lump of crack, squeezing it and feeling it for an extended period of time before removing it from the pocket, but the officer testified that he performed a regular pat-down search and immediately recognized that the lump was crack. *Id.* The district judge chose to believe the officer. *Id. Rivers* was thus distinguishable from *Dickerson,* as under the facts as found by the court "there was no impermissible further searching." *Id.*

Similarly, evidence was admitted in *Craft* because the officer immediately recognized objects as drugs. The defendant voluntarily consented to a pat-down search after deplaning at an airport. While conducting the pat-down search the officer felt bulges around Craft's ankles. The officer testified that based on the feel of the packages and his experience as a drug enforcement officer at the airport it was immediately apparent to him that the bulges were packages of drugs. The officer lifted Craft's pant legs and seized the packages of cocaine and heroin taped to Craft's ankles. Because the officer knew the packages' incriminating character immediately, the motion to suppress was denied. *Craft,* 30 F.3d at 1045.

Notwithstanding *Dickerson's* express reference to the squeezing, sliding, or manipulating of an item after recognition that the item is not a weapon, squeezing an item *to determine in the first instance* whether an item is a weapon may be permissible. The Ninth Circuit, Seventh Circuit Judge Harlington Wood, Jr. sitting by designation and writing the opinion, recently held that when an officer believes an object may be a weapon but cannot tell for sure, "a precautionary squeeze is well within the scope of *Terry.*" *United States v. Mattarolo,* 209 F.3d 1153, 1158 (9th Cir.), *cert. denied,* 531 U.S. 888, 121 S.Ct. 208, 148 L.Ed.2d 146 (2000). While con-

ducting a *Terry* pat-down search of Mattarolo, an officer felt a cylindrical, two or three-inch long object in a pocket. To determine whether it was a small pocket knife the officer closed his thumb and forefinger around the object. Instead of something hard, he felt a package containing chunks, which he immediately recognized as drugs. The officer denied moving his thumb and finger any further to manipulate the package to help identify the contents as drugs. *Id.* at 1156. The court found that

> [t]he possibility of a surprise attack at close quarters with even a small knife presents danger sufficient to justify an officer in taking reasonable protective measures, and such a precautionary squeeze is well within the scope of *Terry.*
>
> Had the officer continued to manipulate the object beyond what was necessary to ascertain that it posed no threat, he would have run afoul of [*Dickerson* ].

*Id.* at 1158.

■ Thus, according to the authorities, squeezing *after determining* an item is not a weapon is clearly impermissible, while squeezing *to determine* that an item is or is not a weapon may still be within the scope of a *Terry* search. *Compare Miles,* 247 F.3d at 1010–11, *with Mattarolo,* 209 F.3d at 1158.

■ Sterling admitted at the evidentiary hearing that he squeezed the bullets in Lemons's pocket. Analysis of whether Sterling's squeeze exceeded the bounds of *Terry* thus requires determining exactly how Sterling patted down Lemons and when, in relation to the squeeze, Sterling realized there was no weapon in Lemons's pocket. Sterling's exact testimony is important:

Q Okay. So, now when you say pat a person down, maybe if you could describe the activity that you're referring to as patting a person down as you did in this instance.

A. Yeah. Basically, you're looking for any type of weapon that may be on the person. He gave me a consent search to check him, and I patted him down and just a basic check of the waistline area, arms, pockets.

Q. And you're holding your hand in an open fashion.

A. Correct.

Q. So you're saying you felt something with those same fingers that you had extended?

A. Yes.

Q. Okay. So when you felt that, what— did it feel indeed like bullets as you referred to?

A. Yes.

Q. At the first instance or later?

A. It felt right away.

Q. Okay.

A. That it was ammunition.

(R. 29 at 10–11.) On cross-examination defense counsel probed further on whether the officer was able to immediately determine what the items were (or were not):

Q. And you patted him down just from top to bottom pretty much?

A. Uh-huh.

Q. And the item that you felt was in his left jacket pocket?

A. Left jacket pocket in the front, lower left.

Q. Okay. And it didn't feel like a gun?

A. No.

Q. It didn't feel like a knife?

A. No.

Q. Didn't feel like any weapon of any sort?

A. It felt like ammunition.

. . . . .

Q. And did you have to manipulate the item at any time to try to determine what it was?

A. As you pat down—you're taught to as you get to clothing to pat and squeeze, and when you squeeze you could feel that it was ammunition.

Q. So when you squeezed the item, at that point you suspected that it might be ammunition.

A. Correct.

(R. 29 at 15–16.) When asked whether he was definite that the items were bullets before removing the sock from Lemons's pocket, Sterling replied ambiguously: "No, it felt like they were bullets, that's why I asked if I could remove them." (R. 29 at 17.)

In court on July 10, 2001, counsel for the government described Sterling's actions as occurring in the following order: (1) he patted Lemons down, (2) he recognized bullets, and (3) he squeezed.

Sterling was unsure in hindsight whether he would have removed the sock from Lemons's pocket if Lemons had not given permission at that point. He also stated on cross-examination that he was definite the items were bullets when he pulled out the sock and looked at it and felt it.

Magistrate Judge Goodstein found that Sterling immediately recognized the items in Lemons's pocket as bullets upon patting him Lemons down. (R. 40 at 8.) He stated that "[n]othing presented disputes this immediate recognition" and that "[a]lthough the defendant invites the court to speculate that Sterling did not immediately recognize the bullets, there is no evidence to support this position." (*Id.*) As a result, he found that Lemons's case fell directly under the precedent of *Rivers*, 121 F.3d at 1046–47, in which the Seventh Circuit upheld the admissibility of crack cocaine

found in the defendant's pocket because the officer conducted a regular pat-down search and immediately recognized the object as contraband.

I find, however, that the magistrate judge's finding inadequately accounts for the conflicting testimony elicited on Sterling's cross-examination about whether he squeezed after determining there was no weapon in Lemons's pocket. Based on this conflicting testimony and the other evidence, I find that Sterling did not immediately recognize the items as bullets. I do not believe this finding is speculation as suggested by the magistrate judge. Instead, I find it to be both supported by the record and the proper characterization of the facts.

While on direct examination Sterling said that he merely used an open hand to pat-down Lemons, on cross examination he admitted that he was actually taught to, and did, pat then squeeze.[2] Government counsel also said that Sterling patted first, then squeezed. When pressed, Sterling indicated that the squeeze was how he identified the bullets: "you're taught to as you get to clothing to pat and squeeze, and when you squeeze you could feel that it was ammunition." (R. 29 at 16.) Similar to the situation in *Miles*, in which a *Terry* violation was found, there is no evidence whatsoever that Sterling's initial pat raised a question about the item being a weapon such that a squeeze was justified, i.e., that upon patting Sterling thought the item could be a small knife or other weapon. *Compare with Miles*, 247 F.3d at 1015 ("The government suggests that the officer might legitimately have been looking for a tiny pen knife, needle, or other slender weapon. But the officer did not testify to such a motivation."). Instead, Sterling expressly indicated that upon patting Lem-

---

2. If this technique of patting and squeezing is standard procedure for West Allis officers, it appears to open them up for problems under *Dickerson* with each and every search.

ons down he knew the items in Lemons's pocket did *not* feel like a gun or knife or any other weapon. (R. 29 at 15–16.) Yet, only when Sterling squeezed the item *after the pat-down* did he realize it was ammunition.

Further, when asked if he knew the items were bullets *before* he removed them from the pocket, Sterling replied "no" and added (emphasis added) that "it felt *like* they were bullets." His testimony suggested that he removed the items from the pocket to be definite they were bullets. He was unsure about whether he would have removed the items if Lemons had not said he could, suggesting that he himself was uncertain whether he had properly identified them. And if Sterling had immediately identified the items as bullets no squeeze would even have been necessary.

Finally, the bullets were inside a sweat sock inside the pocket of a jacket, and I find it at least somewhat questionable that bullets would be immediately identifiable through those layers. I believe based on this record that the items were very likely eliminated as being a weapon, but that they were *not* identified immediately as bullets. In a case reasonably similar to the one before me on this point, a district judge suppressed crack cocaine removed from a suspect's jacket pocket. *United States v. Mitchell,* 832 F.Supp. 1073 (N.D.Miss.1993). Officers admitted that upon patting Mitchell down they knew he was not carrying a weapon. *Id.* at 1079. They testified, however, that they nevertheless immediately recognized crack cocaine in Mitchell's pocket upon patting it. *Id.* at 1078. The court, acknowledging the officers' skills and experience, nevertheless found that the testimony could not be taken as accurate:

> Without question, the officers likely possessed a strong hunch (speculation), prompted by their training and experience, that the pocket contained cocaine.

However, for an immediate probable cause determination, this does not suffice....

> The crack cocaine which was removed from the defendant was contained in six small plastic bags. The plastic bags were wrapped in a white athletic sock. The sock was in a brown paper bag which the defendant carried in the left pocket of a black leather jacket.... [T]he court is not convinced that under the facts of this case, an "immediately apparent" determination of contraband is within the realm of human capability with a single pass of one's hand over the outer clothing.

*Id.* at 1079. After the initial pat, the officers in *Mitchell* were beyond the scope of *Terry* and the emptying of the pocket was unconstitutional. *Id.* Similarly here, while I recognize Officer Sterling's skills and experience, I find it more likely than not that in patting Lemons down Sterling eliminated the possibility of a weapon but did not simultaneously know the identity of the items in the sock inside the pocket.

Thus, because I find that Sterling immediately knew upon patting Lemons down that the items in Lemons's pocket were not a weapon but did not immediately identify them as bullets until he squeezed, he went beyond the scope of a *Terry* pat-down search. There was no immediate identification upon *pat*-down. He squeezed and learned the items were bullets only after realizing that they were not a weapon.

### ii. Inquiry on the Pocket's Contents

Even if Sterling did recognize the bullets immediately upon patting, or did require the squeeze to eliminate the possibility that the item in Lemons's pocket was a weapon such that the manner of his search comported with *Dickerson* and *Mattarolo,* Sterling still committed a *Dickerson* viola-

tion when he questioned Lemons about the items in the pocket. The *Terry* search was a limited search for weapons. It is clear that at the time Sterling asked Lemons about the items in Lemons's pocket Sterling was sure the items were not weapons. Thus, questioning Lemons about the nonweapons in his pocket— whether ammunition or anything else— was an intrusion beyond the scope of the *Terry* search. *See, e.g., Childs,* 256 F.3d at 564–65 ("[A]n overreaching investigation includes questioning that falls outside the scope of the purpose for the seizure.... The only time questions may exceed the scope of the purpose of the detention is when the officer has reasonable suspicion regarding the issue on which he is questioning."); *State v. Munroe,* 244 Wis.2d 1, 630 N.W.2d 223, 2001 WI App 104, ¶¶ 11– 12 (stating that where officers asked defendant if they could enter his motel room to check his identification and were provided adequate identification, their authority to remain in the room ended, and subsequent requests to search for evidence of illegal activity "were themselves unlawful assertions of authority" (emphasis deleted)).

### iii. Seizure of Bullets

■ Further, regardless of whether Sterling committed the above violations under *Dickerson* and *Terry,* the officers still were not entitled to seize the bullets because they were not contraband. The Eighth Circuit recently rejected the notion that ammunition is automatically contraband that can be seized without a warrant. *United States v. Blom,* 242 F.3d 799, 808 (8th Cir.2001), *petition for cert. filed,* No. 00–10814 (June 25, 2001). According to that court, ammunition falls within the plain view doctrine only if the officers seizing the ammunition had probable cause at that time to believe the ammunition was linked to criminal activity. *Id.* Even if the person possessing the gun turns out to be

a convicted felon such that possession would be a federal crime, "the government must prove the officers knew *when they seized the ammunition* that [the person] was a convicted felon." *Id.*

The government first argues that notwithstanding *Blom* ammunition is indeed contraband because of its necessary connection to guns. (The magistrate judge agreed with the government.) The government likens the ammunition in this case to the silencers in plain view in *United States v. Poulos,* 895 F.2d 1113 (6th Cir. 1990), which the Sixth Circuit found were immediately apparent as evidence of unlawful activity. As the government puts it, silencers, like ammunition, are inoperative without a gun, thus if silencers are immediately apparent as contraband, ammunition must be as well.

The silencers at issue in *Poulos* are readily distinguishable from the ammunition in this case. First, the Sixth Circuit found that "in the hands of private individuals, silencers, like sawed-off shotguns, are not 'intrinsically innocent' objects and their possession is a serious crime except under 'extraordinary circumstances.'" *Id.* at 1122. The court recognized that silencers were generally not used in any form of recreation, but instead are usually associated with guns used in criminal activity: "'a readily and easily assembled silencer serves no innocent purpose but is designed to facilitate the killing of another or to effectuate some other pernicious purpose by reducing the noise level of a fired weapon.'" *Id.* (quoting *United States v. Luce,* 726 F.2d 47, 49 (1st Cir.1984)). The same cannot be said of ammunition, which may be used for hunting purposes, recreational target shooting, or otherwise in connection with a lawfully possessed weapon.

Second, although the officers in *Poulos* were legally searching for financial records when they came upon two silencers, the facts of the case involved the actual sale of

960

a silencer-equipped pistol to an undercover agent and the discussed sale of a second silencer to be obtained from out-of-state. The silencers found in the search therefore were extremely suspicious in light of the unique facts of the case. *Id.* at 1116, 1122. Unlike *Poulos,* the ammunition found in Lemons's pocket cannot compare to the silencers as to the level of suspicion generated under the circumstances. There was probable cause to believe Poulos was involved in the illegal possession and sales of weapons with silencers, so obviously additional silencers would be incriminating. Here, there was merely suspicion that Lemons was carrying a weapon, but no weapon was found. The existence of ammunition could not be considered incriminating under such circumstances.

Finally, in *Poulos,* possessing silencers without serial numbers was a crime, and the silencers could plainly be seen not to have the required serial numbers. *Id.* at 1123 n. 7. Thus, the criminality of the silencers themselves was immediately apparent upon visual inspection. In the present case, though, the government has presented no argument that the possession of ammunition by itself is any sort of crime.

In addition to *Blom* I have found at least three other districts courts that have indicated that guns and ammunition are not automatically contraband. In *United States v. Borno,* 946 F.Supp. 972 (M.D.Fla. 1996), the district court suppressed a handgun found inside a car searched during execution of a search warrant of a residence for evidence of drug trafficking, finding that the plain view doctrine did not apply. Although drugs were found in the residence, nothing indicated any link between that gun and the drugs such that the officers had probable cause to seize the gun. *Id.* at 977. Accordingly, "the incriminating nature of the 9mm handgun was not immediately apparent." *Id.*

In *United States v. Saari,* 88 F.Supp.2d 835 (W.D.Tenn.1999), police had unconstitutionally arrested defendant Saari in his house, where they then viewed ammunition. The district court adopted a magistrate judge's recommendation that a motion to suppress the ammunition be granted, both because the police were not in the house legally, and also because

it is not clear that any of the evidence in issue would have had an incriminating character that was immediately apparent to the officers. In the living room, officers saw videotapes, a parabolic antenna, and two metal ammunition boxes. Unlike narcotics or drug paraphernalia, these items are not illegal under ordinary circumstances.

*Id.* at 850. The court so stated even though Saari had been arrested based on reports of shots being fired at a house. *See id.* at 843–44, 850.

Similarly, the district judge in *United States v. Bater,* 830 F.Supp. 28, 39 (D.Mass.1993), stated that "[u]nder ordinary circumstances, the government cannot simply seize property, which may be legally possessed, without any reason to believe it is not so, even if that property is a weapon. The regulatory regime for firearms registration does not make weapons and ammunition, standing alone, contraband." The district court in *Bater* eventually found that the weapons and ammunition in that case were contraband, but only because officers were searching under a warrant for stolen property resulting from a burglary, and the court considered guns and ammunition to be tools of the burglary trade, thus making them evidence of a crime. *Id.* at 39–42.

I agree with these courts that ammunition alone cannot be considered contraband. Therefore, the government must prove the officers had probable cause to believe the bullets were linked to some criminal activity.

The record is clear, however, that the West Allis police officers did not check Lemons's record (or even his outstanding warrants[3]) until after the bullets were seized. At the time of seizure, therefore, the bullets could not be seized under the theory that they were evidence regarding a felon-in-possession violation.

 The government, in its response to Lemons's objections and in a recent short brief responding to questions I asked in court on July 10, contends that even if the bullets were not contraband under felon-in-possession laws, they were nevertheless evidence of the crimes of disorderly conduct and carrying a concealed weapon because the officers had been told Lemons flashed a gun to the passengers in the truck.[4]

Again, as indicated in *Blom*, 242 F.3d at 808, ammunition falls within the plain view doctrine only if the officers seizing the ammunition at the time had *probable cause* to believe the ammunition was linked to criminal activity—whether that be a person's felon-in-possession violation or other crime.

While I have found Waara's statement that Lemons flashed a gun to provide reasonable suspicion such that a limited pat-down search was permissible, I do *not* find that statement to constitute probable cause to believe Lemons had committed the crimes of disorderly conduct or carrying a concealed weapon. And if officers had no probable cause to believe either of these crimes had been committed, they likewise had no probable cause to believe the bullets could be linked to such crimes.

Waara's statement alone certainly did not provide probable cause. The government itself, in front of Magistrate Judge Goodstein, discussed Waara's statement as providing alone only reasonable suspicion, rather than probable cause, of a concealed weapon or disorderly conduct crime. (*See* R. 33 at 3–4.) Waara, although disinterested and apparently genuinely worried for his safety, had no history of providing accurate information to police. *See Adams*, 407 U.S. at 146–47, 92 S.Ct. 1921 (stating that informant's tip established reasonable suspicion but likely *not* probable cause where informant, known to officer personally, volunteered information "immediately verifiable at the scene"). Further, although the accident occurred on a lighted street, it was the middle of the night and thus dark. And, importantly, Waara's statement was not corroborated but was instead discredited, as Lemons had been found *not* to have a gun in his waistband. *Cf. id.* at 148, 92 S.Ct. 1921 ("Once Sgt. Connolly had found the gun precisely where the informant had predicted probable cause existed to arrest Williams for unlawful possession of the weapon.").

While Sterling's knowledge of the bullets themselves (assuming for argument's sake that such knowledge was constitutional) may have added some slight suspicion or corroboration, I find that it was not enough to raise the information the officers had to the level of probable cause to believe Lemons committed either of these crimes. The reliability of Waara's siting of the gun—discredited because no gun was found and with no other corroboration other than the slight corroboration created by

---

3. Sterling testified that he did not believe Lemons's outstanding warrants were for felonies, (R. 29 at 23), and did not testify as to whether the warrants were based on prior convictions or mere charges. Officers thus likely did not learn that Lemons was a convicted felon until sometime later.

4. In an earlier brief the government had merely argued conclusorily that the requirements for a seizure of items in plain view "all exist in the present case." (R. 33 at 6.)

the bullets—was not high enough to rise to the level of probable cause to believe a gun was present, let alone that other elements of the crimes of carrying a concealed weapon or disorderly conduct (none of which the government sets forth in any event) were met.

Sterling's own testimony indicates that he did not believe he had probable cause to seize the bullets. He did not arrest Lemons based on concealed weapons or disorderly conduct violations; he instead stated that he arrested Lemons based on the outstanding warrants. Moreover, he stated that when he finds ammunition, "the second thought you have is that there's a gun. So it rises [sic] your suspicion a little more." (R. 29 at 11.) Raising the reasonable suspicion from Waara's statements just a little bit more does not, in this case, raise the officers' knowledge to the probable cause standard for these crimes.

The officers needed probable cause, not a hunch, that the bullets were evidence of a crime, and they did not even have probable cause to believe any crime occurred, let alone that bullets were related to it. The seizure of the bullets was therefore unconstitutional.

### 2. Consent

The government bears the burden of proving by a preponderance of the evidence that consent was freely given, and the burden is not satisfied by showing a mere submission to a claim of lawful authority. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Raibley,* 243 F.3d 1069, 1076 (7th Cir.2001), *petition for cert. filed,* No. 00–10751, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d —— (June 18, 2001).

#### a. Initial Consent to Pat–Down

The initial questioning and pat-down of Lemons's person was valid for a second

reason: Lemons consented to it. In front of Magistrate Judge Aaron E. Goodstein Lemons argued that Sterling's testimony that defendant consented to a pat-down search was contradicted by Morrissey, who said he did not hear Lemons give consent even though Morrissey stood close by. Lemons, however, provided no evidence that he did not consent, and Magistrate Judge Goodstein found that Sterling's testimony was not contradicted or drawn into question. Morrissey was nearby but paying attention to both Lemons and Woods and may not have heard all of the conversation between Sterling and Lemons. Magistrate Judge Goodstein therefore found that defendant did in fact consent to a pat-down search. Before me, Lemons concedes that he consented to a pat-down search for weapons. (R. 56 at 1.) In any event, I agree that on the record before me defendant did consent to a pat-down search.

#### b. Consent for Search Beyond Scope of *Terry*

■ That Lemons consented to a pat-down search does not justify seizure of the bullets, though, as the government contends. The government argues that once defendant gave his consent to the pat-down, Sterling was entitled to search defendant's pockets and remove the bullets, regardless of *Dickerson* and *Terry.* I disagree.

The scope of consent can be delimited by the person being searched. *Jimeno,* 500 U.S. at 252, 111 S.Ct. 1801. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* at 251, 111 S.Ct. 1801.[5]

---

5. If, for instance, it was objectively reasonable

for an officer to believe that a person's con-

The Eighth Circuit has held that the *Dickerson* limitation applies to consensual pat-down searches as well as those based solely upon a *Terry* stop and search where no consent is given, *Craft*, 30 F.3d at 1045, and I agree.

Under both *Jimeno* and *Craft* I find that Lemons's consent to be searched extended only as far as a *Terry* pat-down search for weapons and no further. Sterling clearly asked only for a pat-down search, and impliedly indicated the basis of the search was to check Lemons for the weapon Waara had reported.

The government argues that an ordinary person in Lemons's position would have thought he was giving consent to a fuller search than just a *Terry* pat-down, and thus a reasonable officer would have thought he had permission to squeeze the pocket, ask Lemons about its contents, and then empty Lemons's pocket. The argument, though, is not supported by the specific facts of this case, nor is it objectively reasonable generally.

First, Sterling specifically used the word "pat" in his request to Lemons to look for weapons; he did not ask to "search" Lemons nor to reach into Lemons's pockets for objects smaller than weapons. And if Sterling thought the first consent was sufficient to do a full search of Lemons, including his pockets, Sterling later would not have asked Lemons for permission to remove the items from the pocket. Sterling's testimony that he was unsure he would have emptied the pocket absent consent indicates that he thought the first consent extended only to a *Terry* pat-down search and no further.

Second, although the government contended otherwise at argument on July 10, I think that an ordinary person would *not*

have thought that consent to a pat-down search meant consent to a broader search as well—i.e., that "can I pat you down" actually means "can I search you." With the age and history of *Terry*, the number of television shows and movies involving pat-downs for weapons, and general public knowledge about the differences between a stop-and-frisk and an arrest and full search, I believe the ordinary person in either the suspect's or the officer's position would know that a consent to a pat-down means a consent to a *Terry* pat-down search. The Eighth Circuit's decision in *Craft* confirms my belief.

### c. Consent to Emptying of Pocket

Lemons's second consent in no way cures the invalid search, either. *See Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *United States v. Childs*, 256 F.3d 559 (7th Cir. 2001); *United States v. Thomas*, 955 F.2d 207, 210 (4th Cir.1992).

Generally, consent to a search is first examined in light of the "totality of the circumstances" to see whether it was voluntary. *Childs*, 256 F.3d at 566–67. The court considers the age, education and intelligence of the person giving consent; whether he was advised of his constitutional rights; the length of time he was detained prior to giving consent; whether he immediately consented or was repeatedly asked; whether any physical coercion occurred; and whether the person was in custody when he gave consent. *Id.*

If a consent was obtained following an illegal *Terry* inquiry or seizure, however, the voluntariness of a consent can be negated. *Id.* The government has a "heavy burden" to purge the consent of that taint, and in that regard the court considers the

---

sent extended to the opening of particular containers within an automobile, the officer has acted within the parameters of the Fourth Amendment. *Jimeno*, 500 U.S. at 249, 252, 111 S.Ct. 1801.

temporal proximity of the consent to the illegal search or seizure, the presence of any intervening factors between the two events, and whether the circumstances of the violation negated the voluntariness of the consent. *Id.*

An example of negated consent can be found in *White*, 496 U.S. at 328, 110 S.Ct. 2412, in which a consent following a challenged stop was not considered in the Supreme Court's discussion of whether the stop was reasonable. White was stopped by police based upon an anonymous tip confirmed only in part. Upon request by the officers, White allowed them to look for drugs in her vehicle. *Id.* at 326–27, 110 S.Ct. 2412. After being charged with drug possession, White moved to suppress the drugs, asserting that the officers did not have the reasonable suspicion necessary under *Terry* to stop her. *Id.* at 327–28, 110 S.Ct. 2412. The state courts found the stop to have been unconstitutional and the drugs to have been the fruit of the unconstitutional detention. *Id.* at 328, 110 S.Ct. 2412. The Supreme Court's decision holding that the officers did in fact have reasonable suspicion would have been unnecessary if the defendant's consent cured any problem with the stop itself.

*Thomas* is even more direct support for holding that consent on the heels of an illegal search or seizure is fruit of the illegal conduct. Police officers illegally entered a hotel room based on suspicion that its two occupants were dealing drugs. Instead of drugs, officers found a bag containing thousands of dollars in cash, linking the occupants to a bank robbery. *Thomas*, 955 F.2d at 208. There was no dispute that this search was unconstitutional. *Id.* One of the hotel room occupants, Henry, was thereafter confronted by police with the fact that they had found the cash; Henry then consented to a search of the hotel room. *Id.* at 209. Evidence taken in that search was then used against the second occupant, Thomas, at trial; Thomas believed the evidence had to be suppressed. *Id.* The Fourth Circuit found that the consent to search could not be used as a basis for admission of the evidence because Henry cooperated only after being confronted with the money; the unconstitutional search tainted what followed. *Id.* at 210–11.

In *Childs*, the case in which the Seventh Circuit set forth the three considerations for examining a possibly-tainted consent, an officer stopped Childs's car based on a broken windshield. The officer then unconstitutionally questioned Childs about drug possession and obtained consent to search Childs for drugs. The Seventh Circuit found that the consent was obtained immediately following the Fourth Amendment violation, without any intervening events. It remanded, however, for consideration of whether the circumstances of the violation negated the voluntariness of the consent. *Childs*, 256 F.3d at 566–67.

In the present case I find, as in *Childs*, that Lemons's consent to the emptying of his pocket was obtained immediately following the *Dickerson* violations, with no intervening events. The remaining considerations, then, are the voluntariness of Lemons's consent and whether the circumstances of the Fourth Amendment violations negated that consent.

The voluntariness of Lemons's consent to the emptying of his pocket is arguable. Lemons is an adult, had not been detained more than a few minutes before giving consent, consented immediately, and no physical force had been used other than the patting down. On the other hand, Lemons was not advised of his right to refuse consent, and, as recognized in *Terry* itself, being stopped for a pat-down search is a form of physical custody. *See Terry,* 392 U.S. at 16, 88 S.Ct. 1868. No information on Lemons's education or intelligence

was presented, although Sterling testified that Lemons seemed to understand him. Lemons, though, appeared intoxicated, reducing somewhat any reliance on Lemons's ability to understand Sterling.

Nevertheless, whether or not these factors suggest voluntariness, I find that the *Dickerson* violations negate any apparent voluntariness. As in *Thomas,* the request for consent occurred only on the basis of the invalid searches, at a point when Lemons likely believed Sterling already knew what had been found. Lemons's consent could be considered closely related to Sterling's squeezing of Lemons's pocket, as Lemons saw Sterling recognizing the contents. The consent, moreover, was directly related to the improper questioning of Lemons regarding the pocket's contents at a time when Sterling knew the pocket did not contain a weapon. The Fourth Amendment violations negated the consent Lemons gave to the emptying of his pocket.

Thus, I find that although Lemons consented to a *Terry* pat-down search as limited by *Dickerson,* he did not consent to a fuller search that included the squeezing of and emptying of his pocket. The bullets therefore will be suppressed.

### 3. Inevitable Discovery

Evidence obtained following a Fourth Amendment violation is not automatically subject to suppression. *United States v. Eylicio–Montoya,* 70 F.3d 1158, 1165 (10th Cir.1995). Evidence obtained unlawfully is admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means," *Nix,* 467 U.S. at 444, 104 S.Ct. 2501—i.e., that it would have been discovered in the absence of the Fourth Amendment violation. This limitation on the scope of the exclusionary rule insures that the police and the prosecution are not put in a worse position than if there had been no Fourth Amendment violation. *Eylicio–Montoya,* 70 F.3d at 1165; see *Nix,* 467 U.S. at 443–44, 104 S.Ct. 2501.

The government argues that the bullets are admissible because the police officers would inevitably have discovered them in connection with arresting Lemons on the outstanding warrants. A full search of a person arrested is a reasonable search under the Fourth Amendment. *New York v. Belton,* 453 U.S. 454, 459, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). The government, though, has presented absolutely no evidence that police would have run Lemons's name through dispatch if they had not found the bullets—no evidence, for instance, that running names through dispatch is standard procedure for car accidents, or that they ran the names of all six people involved in the two-car accident. Instead, the government presents only speculation. Therefore, the government cannot prove by a preponderance of the evidence that it would inevitably have discovered the outstanding warrants and placed Lemons under arrest.

### B. The Car

Because Magistrate Judge Goodstein found no Fourth Amendment violation, he recommended accordingly that the motion to suppress the gun from the car be denied. Because I have found that the Fourth Amendment was indeed violated, the search of the car must be addressed in further detail.

Fourth Amendment rights are personal; a person charged with a crime of possession can claim the benefits of the exclusionary rule only if his own Fourth Amendment rights have been violated. *United States v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. 128, 133–34, 138, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

An illegal search violates the rights of only those who have a "legitimate expectation of privacy in the invaded place." *Id.* at 143, 99 S.Ct. 421. The person searched bears the burden of proving that he had a legitimate expectation of privacy in the area searched. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *see Rakas,* 439 U.S. at 131 n. 1, 99 S.Ct. 421.

Generally, a mere passenger in a car does not have a protectable Fourth Amendment interest for a direct challenge to the search of the car. *Rakas,* 439 U.S. at 148–49, 99 S.Ct. 421; *Eylicio–Montoya,* 70 F.3d at 1162; *United States v. Durant,* 730 F.2d 1180, 1182 (8th Cir.1984). Where a passenger asserts neither a property nor a possessory interest in the car or the property seized, the passenger has no expectation of privacy in the passenger compartment, including the area under the seat of the car, and thus generally cannot invoke the Fourth Amendment to exclude items seized there. *Rakas,* 439 U.S. at 148–49, 99 S.Ct. 421.

If, however, the legality of a *Terry* stop and pat-down search of a passenger's person is at issue, the passenger *can* challenge the admission of evidence seized from the car as a result of the illegal stop or pat-down search as being the fruit of the illegal conduct. *Eylicio–Montoya,* 70 F.3d at 1162–63; *Durant,* 730 F.2d at 1182. The distinction does not at all offend *Rakas,* as the passengers in that case challenged neither the initial traffic stop nor their arrests. *Eylicio–Montoya,* 70 F.3d at 1162–63; *see Rakas,* 439 U.S. at 130, 99 S.Ct. 421. It is recognized by the Eighth and Tenth Circuits as well as commentators, *see* 5 Wayne R. LaFave, *Search*

*and Seizure: A Treatise on the Fourth Amendment* § 11.3(e), at 173 (3d ed. 1996) ("If either the stopping of the car or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit."). I will follow suit.

Lemons has not argued that he had any protectable interest in the car or gun such that he can challenge the search under *Rakas.* He attacks the car search only under the theory that the search of the car was fruit of the illegal search of his pocket and the illegal seizure of the bullets.

The government argues that the car search was valid as incident to the arrest of Lemons and Woods and that the gun would have been inevitably discovered in an inventory search.[6]

As stated above, evidence obtained in violation of the Fourth Amendment is admissible if it would inevitably have been discovered notwithstanding the violation. *Nix,* 467 U.S. at 444, 104 S.Ct. 2501. This inevitable discovery doctrine provides the basis for admission of the gun, as it would have been recovered in a search incident to Woods's arrest or in the inventory of the Ford Taurus following Woods's arrest.

A search of a car's passenger area is valid when incident to arrest. *Belton,* 453 U.S. at 460, 462, 101 S.Ct. 2860. In this case, no evidence contradicts Spath's testimony that driving without a valid license was an offense for which one could be arrested, and that it was the usual policy to arrest persons found driving on a suspended license and take them to the police

---

6. Except in response to recent court questioning, the government did not argue that the gun was admissible under *Michigan v. Long,* 463 U.S. 1032, 1035, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), but rather argued only that the car search was valid as incident to the arrest of Lemons and Woods and that the gun would have been inevitably discovered in an inventory search. I therefore decline to address the applicability of *Long* to this case.

station. *Cf. Atwater v. City of Lago Vista,* 532 U.S. 318, ——, 121 S.Ct. 1536, 1557, 149 L.Ed.2d 549 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Woods admitted to the officers that he was driving but did not have a valid license. I thus find that Woods would have been arrested for driving without a valid license, whether or not police had previously recovered the bullets at that time. The gun would have been found in a search incident to Woods's arrest.

Further, government counsel indicated in court on July 10 that the West Allis police policy is to impound a car when the driver is arrested. Lemons did not object to this statement by government counsel, nor does he assert that police would not have impounded and thereafter inventoried the car regardless of the search of himself. Nor does Lemons challenge the reasonableness of impoundment under the circumstances. Inventory searches are a "well-recognized exception" to the warrant requirement. *United States v. Wilson,* 938 F.2d 785, 788 (7th Cir.1991). Thus, I find that the police would have impounded and inventoried the car following Woods's arrest and then would have found the gun during the inventory of the car's contents.

### III. CONCLUSION

Sterling exceeded the bounds of a *Terry* search by squeezing Lemons's pockets and asking Lemons about the pocket's contents, and, in any event, the bullets recovered from Lemons's pocket were seized illegally because they were not contraband. Lemons did not consent to any search or seizure beyond the scope of *Terry.* As a result, the bullets must be suppressed.

The gun recovered from the car is admissible, however, as it would inevitably have been discovered in a search incident to the arrest of the driver or in the inventory of the car's contents after the car was impounded.

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation is **REJECTED IN PART AND MODIFIED IN PART,** as I believe the bullets recovered from Lemons's pocket must be suppressed and the gun recovered from the car admitted, but on grounds differing from the magistrate judge's.

**THUS, IT IS ORDERED** that Lemons's motion to suppress is **GRANTED** regarding the bullets from his pocket and **DENIED** regarding the gun.